No. 104,098

STATE OF KANSAS, *Appellee*, v. ROY SEWARD, *Appellant*.
(297 P.3d 272)

Opinion filed March 22, 2013.

*Rachel L. Pickering*, of Kansas Appellate Defender Office, was on the briefs for appellant.

*Christina Trocheck*, assistant county attorney, *Ellen Mitchell*, county attorney, and *Derek Schmidt*, attorney general, were on the brief for appellee.

The opinion of the court was delivered by

BEIER, J.: Defendant Roy Seward appeals his sentences following his guilty pleas to one count of rape and one count of aggravated criminal sodomy for acts committed against his stepdaughter. The district court judge sentenced Seward to concurrent hard 25 life sentences under Jessica's Law, K.S.A. 21-4643(a)(1)(B) and (D) (now K.S.A. 2012 Supp. 21-6627), and to lifetime postrelease supervision.

Seward argues that his hard 25 life sentences are disproportionate and violative of the Eighth Amendment to the United States Constitution and § 9 of the Bill of Rights of the Kansas Constitution. Both of these challenges are case specific. We reject them. Seward does not pursue an Eighth Amendment categorical challenge to his sentences on this appeal, and thus any such earlier challenge is deemed abandoned. In addition, we note that the dis-

trict court judge erred in ordering lifetime postrelease supervision, and we vacate that portion of her sentencing pronouncement.

## FACTUAL AND PROCEDURAL BACKGROUND

Seward originally was charged with two counts of rape and six counts of aggravated criminal sodomy based on allegations made by his then 11-year-old stepdaughter, R.T. She told investigators that Seward had touched his "private" to her "private" and that he had "put it in." She said this happened more than once but less than five times. R.T. also said that Seward put his "private" inside her "buttocks" on several occasions and that "it hurt." When asked if Seward made her touch him, R.T. nodded her head and said that "he made me suck on it," referring to Seward's "private" area. R.T. thought this conduct occurred once a week for several weeks. She also said that Seward licked her "private" about three times. According to R.T., Seward showed her a movie on his computer of people "doing it," and the investigator confirmed with R.T. that people were having sex in the movie. R.T. also told investigators that Seward told her not to tell anyone. A sexual assault examination of R.T. revealed a healed injury to her hymen.

In exchange for Seward's guilty pleas to one count of rape and one count of aggravated criminal sodomy, the State dropped the remaining charges.

Before sentencing, Seward filed a departure motion in which he argued, *inter alia*, that "[t]he life imprisonment sentence provided for by 'Jessica's Law,' K.S.A. 21-4643, is disproportionate and cruel and unusual under the state and federal constitutions." At Seward's sentencing hearing, defense counsel made a brief reference to the alleged unconstitutionality of Jessica's Law. The district judge did not address Seward's constitutional arguments, denied the departure motion, and sentenced Seward to two concurrent hard 25 life sentences and lifetime postrelease supervision. On Seward's appeal, we remanded the case so that the district judge could enter "sufficient factual findings and conclusions of law" on Seward's constitutional claims. *State v. Seward*, 289 Kan. 715, 721, 271 P.3d 443 (2009).

In his brief submitted to the district judge before the hearing on remand, Seward argued that the district judge should consider that Seward had been a victim of childhood physical and sexual abuse himself; that both he and his mother suffer from bipolar disorders; that he spent 5 years of his youth in a boys' home; that he dropped out of high school in the 10th grade; that he has low intelligence; that his guilty pleas saved the victim from the trauma of testifying at trial; that he expressed remorse; that he had no history of violent or sexual misbehavior; and that a psychological evaluation indicated he had a low risk of recidivism. Seward also provided a comparison of sentences in this and other jurisdictions.

The district judge determined that the imposition of two hard 25 life sentences was not disproportionate to the offenses committed and thus did not constitute cruel and/or unusual punishment.

## DISCUSSION

*Standards of Review*

When considering a case-specific disproportionality challenge to a sentence under the Eighth Amendment and § 9, a district judge must make factual findings and draw conclusions of law. See *State v. Woodard*, 294 Kan. 717, 720, 280 P.3d 203 (2012) (citing *State v. Ortega-Cadelan*, 287 Kan. 157, 160-161, 194 P.3d 1195 [2008]). "These inquiries invoke a bifurcated standard of review: without reweighing the evidence, the appellate court reviews the factual underpinnings of the district court's findings under a substantial competent evidence standard, and the district court's ultimate legal conclusion drawn from those facts is reviewed de novo. [Citations omitted.]" *Woodard*, 294 Kan. at 720.

In addition, a statute is presumed constitutional, and all doubts must be resolved in favor of its validity. *State v. Britt*, 295 Kan. 1018, Syl. ¶ 13, 287 P.3d 905 (2012); *Woodard*, 294 Kan. at 720. "If there is any reasonable way to construe a statute as constitutionally valid, the court has the authority and the duty to do so." *Britt*, 295 Kan. 1018, Syl. ¶ 13.

*Section 9 Analytical Framework*

Section 9 of the Kansas Constitution Bill of Rights provides:

"All persons shall be bailable by sufficient sureties except for capital offenses, where proof is evident or the presumption great. Excessive bail shall not be required, nor excessive fines imposed, nor cruel or unusual punishment inflicted." Kan. Const. Bill of Rights, § 9.

"Under § 9 of the Kansas Constitution Bill of Rights, a punishment may be constitutionally impermissible, although not cruel or unusual in its method, if it is so disproportionate to the crime for which it is inflicted that it shocks the conscience and offends fundamental notions of human dignity." *State v. Gomez,* 290 Kan. 858, Syl. ¶ 9, 235 P.3d 1203 (2010). Whether a sentence is "cruel or unusual" under § 9 because of its length is controlled by a three-part test, first outlined in *State v. Freeman,* 223 Kan. 362, 367, 574 P.2d 950 (1978). This three-part test weighs the following:

"(1) The nature of the offense and the character of the offender should be examined with particular regard to the degree of danger present to society; relevant to this inquiry are the facts of the crime, the violent or nonviolent nature of the offense, the extent of culpability for the injury resulting, and the penological purposes of the prescribed punishment;

"(2) A comparison of the punishment with punishments imposed in this jurisdiction for more serious offenses, and if among them are found more serious crimes punished less severely than the offense in question the challenged penalty is to that extent suspect; and

"(3) A comparison of the penalty with punishments in other jurisdictions for the same offense." 223 Kan. at 367.

No single factor under the *Freeman* test controls the outcome. *State v. Berriozabal,* 291 Kan. 568, 591, 243 P.3d 352 (2010); *State v. Mondragon,* 289 Kan. 1158, 1163, 220 P.3d 369 (2009).

*Eighth Amendment Analytical Framework*

The Eighth Amendment to the United States Constitution provides that "[e]xcessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." It has been extended to the states under the Fourteenth Amendment to the United States Constitution. See *Robinson v. California,* 370 U.S. 660, 667, 82 S. Ct. 1417, 8 L. Ed. 2d 758 (1962).

In *Gomez*, this court outlined the framework for Eighth Amendment disproportionality challenges in light of the United States Supreme Court's decision in *Graham v. Florida*, 560 U.S. 48, 59, 130 S. Ct. 2011, 176 L. Ed. 2d 825 (2010) (holding that the concept of proportionality is central to an Eighth Amendment analysis of cruel and unusual punishment). *Gomez*, 290 Kan. 858, 862-66. In its discussion of *Graham*, this court explained that the United States Supreme Court recognizes two general classifications of Eighth Amendment "cruel and unusual" challenges: (1) case-specific and (2) categorical. *Gomez*, 290 Kan. at 863-64.

A case-specific claim challenges the length of a term-of-years sentence, given all of the relevant circumstances in a particular case. *Gomez*, 290 Kan. at 863-64. The second classification, a categorical challenge, requires the court to implement the proportionality standard according to certain categorical restrictions, a classification that had historically been reserved for death penalty cases. *Gomez*, 290 Kan. at 864. The "Eighth Amendment to the United States Constitution does not require strict proportionality between a crime and a sentence; rather, it forbids only an extreme sentence that is *grossly disproportionate* to the crime." (Emphasis added.) *Woodard*, 294 Kan. at 721 (citing *Ewing v. California*, 538 U.S. 11, 20-21, 123 S. Ct. 1179, 155 L. Ed. 2d 108 [2003]).

The analytical steps for a case-specific challenge, according to *Gomez*, are as follows:

"[A] court must begin by comparing the gravity of the offense and the severity of the sentence. This analysis can consider a particular offender's mental state and motive in committing the crime, the actual harm caused to the victim or to society by the offender's conduct, any prior criminal history, and a particular offender's propensity for violence. In the rare case in which this threshold comparison leads to an inference of gross disproportionality, the court should then compare the [offender's] sentence with the sentences received by other offenders in the same jurisdiction and with the sentences imposed for the same crime in other jurisdictions. If this comparative analysis validates an initial judgment that the sentence is grossly disproportionate, the sentence is cruel and unusual." *Gomez*, 290 Kan. 858, Syl. ¶ 5.

The first comparison in a case-specific challenge under the Eighth Amendment, juxtaposing the gravity of the offense and the severity of the sentence, is a threshold determination. *Gomez*, 290 Kan.

858, Syl. ¶ 5. Only in the rare case when this threshold comparison leads to an inference of gross disproportionality does this court move on and consider the defendant's sentence against sentences received by other offenders in the same jurisdiction and sentences imposed for the same crime in other jurisdictions. *Gomez*, 290 Kan. 858, Syl. ¶ 5.

*Gomez* also set out the following steps for a categorical proportionality challenge:

"In considering a categorical challenge, a court first considers objective indicia of society's standards, as expressed in legislative enactments and state practice to determine whether there is a national consensus against the sentencing practice at issue. Next, guided by the standards elaborated by controlling precedents and by the court's own understanding and interpretation of the Eighth Amendment's text, history, meaning, and purpose, the court must determine in the exercise of its own independent judgment whether the punishment in question violates the United States Constitution. The judicial exercise of independent judgment requires consideration of the culpability of the category of offenders at issue in light of their crimes and characteristics, along with the severity of the punishment in question. In this inquiry the court also considers whether the challenged sentencing practice serves legitimate penological goals of retribution, deterrence, incapacitation, and rehabilitation." *Gomez*, 290 Kan. 858, Syl. ¶ 7.

Although Seward has abandoned any categorical challenge to his sentence in this case, we pause here to clarify our earlier decision in *Woodard*, whose language could be read to conflate the classifications of Eighth Amendment challenges with the step-by-step comparisons necessary to a case-specific challenge. 294 Kan. at 721-22. This clarification will be of some assistance in resolving this case and will facilitate resolution in future cases.

The *Woodard* opinion stated that the first comparison under an Eighth Amendment case-specific challenge, *i.e.*, comparing the gravity of the offense and the severity of the sentence, is a threshold determination. But the opinion then stated:

"Under the first *classification*, which is a threshold determination, this court is asked to determine whether Woodard's sentence is grossly disproportionate given the circumstances of his case.

. . . .

"We conclude that Woodard's sentences are not grossly disproportionate to the crimes. We therefore do not proceed to the *second classification for comparisons* under Eighth Amendment analysis. See *Graham v. Florida*, 560 U.S. 48, 61-62,

130 S. Ct. 2011, 176 L. Ed. 2d 825 (2010)." (Emphasis added.) *Woodard*, 294 P.3d at 21-22.

The first classification, *i.e.*, a case-specific challenge, is not a threshold determination. Our statement in *Woodard* appears to suggest that, had a claim-specific challenge been successful, the court would have moved on to a categorical analysis. This is misleading; case-specific and·categorical challenges are analytically independent of each other. See *Berriozabal*, 291 Kan. at 594 (remanding so defendant could articulate the specific grounds for his Eighth Amendment challenge: "a case-specific proportionality challenge, a categorical challenge, or both"). The defendant in *Woodard* did not raise a categorical challenge; he argued only that his sentence was "cruel and/or unusual punishment under the facts of his crimes." *Woodard*, 294 Kan. at 719.

The *Woodard* opinion later reads: "The analysis of [the first *Freeman*] prong closely tracks the analysis of the first *classification* under the Eighth Amendment to the United States Constitution." (Emphasis added.) *Woodard*, 294 Kan. at 723. More clearly stated, the first prong of the *Freeman* test closely tracks the first *comparison* under an Eighth Amendment claim-specific challenge. Or, as this court explained in *State v. Ross*, 295 Kan. 424, 429, 284 P.3d 309 (2012): "Our analysis under the *Freeman* factors for the Kansas constitutional challenge applies with equal force to the first of the classifications for an Eighth Amendment challenge."

Later in the *Woodard* opinion, after addressing the first prong of the *Freeman* test, the court concluded that the defendant's sentence did not violate § 9 of the Kansas Constitution Bill of Rights. *Woodard*, 294 Kan. at 723. But, again, the first prong of the *Freeman* test is not a threshold determination. See *State v. Mossman*, 294 Kan. 901, 924-25, 281 P.3d 153 (2012); *Ortega-Cadelan*, 287 Kan. at 161 ("Ultimately, one consideration may weigh so heavily that it directs the final conclusion. Before that conclusion is reached, however, consideration should be given to each prong of the test."). The *Woodard* opinion did consider the two additional prongs of the *Freeman* test, but the apparent finality of the court's conclusion after analyzing the first prong could be viewed as inconsistent with the correct holistic approach.

*Application of the § 9 Framework to Seward's Case*

The first prong of the *Freeman* three-part test requires this court to consider the nature of the offense and the character of the offender. *Britt*, 295 Kan. at 1033.

Here, the district judge made several factual findings that favored imposition of the hard 25 sentences under the first prong of *Freeman*: Seward held a position of authority and trust over R.T. and told her not to tell anyone about the abuse. He caused her physical pain and injury; and rape and aggravated criminal sodomy are violent offenses. See K.S.A. 22-3717(d)(2)(A), (E). The district judge also considered R.T.'s age at the time of abuse—between 8 and 10—and the fact that Seward had showed her a pornographic movie.

Regarding the degree of violence attendant to the offenses, Seward argues that the "State did not present evidence that [he] used a weapon to commit the crimes, that he kidnapped or otherwise terrorized R.T." But this argument does not undercut the sexual violence of rape and aggravated criminal sodomy. Simply because Seward could have committed these acts more violently does not mean they are not violent in their most basic form, particularly when committed against an especially vulnerable victim.

Seward also argues that his childhood physical and sexual victimization, his abandonment by his family, his lack of criminal history, his desire to seek treatment, and his low risk to reoffend weighed in his favor on the first prong of § 9 disproportionality analysis under *Freeman*. But the district judge stated during the remand hearing that Seward's "troubled childhood" increased the likelihood that he would reoffend, and she noted that Seward had not sought treatment on his own.

In particular, we note that, during a sex offender evaluation conducted as part of Seward's presentence investigation, he "denied having sexual intercourse with the victim" and "minimize[d] both the frequency of his sexual offending as well as the sexual acts that were allegedly performed." This reaction to his crimes does not bode well for Seward's ability to conduct himself appropriately in the future. The legislative intent behind Jessica's Law was to re-

move perpetrators of sexual crimes against children from society. *State v. Spencer*, 291 Kan. 796, 823-24, 248 P.3d 256 (2011). Because of high rates of recidivism among such offenders, the State "has a particularly compelling interest in using incarceration as a means of protecting its youth." *Woodard*, 294 Kan. at 722.

Our review of the record reveals substantial competent evidence supporting the district court's factual findings relevant to the first prong of *Freeman*. And these facts, in turn, support the conclusion that Seward's sentences are not so disproportionate to his crimes that they "shock[] the conscience and offend[] fundamental notions of human dignity." *Gomez*, 290 Kan. 858, Syl. ¶ 9.

Under the second prong of the *Freeman* analysis, this court compares Seward's sentence for rape and aggravated criminal sodomy with the penalties imposed for "more serious crimes" in Kansas. See *Freeman*, 223 Kan. at 367.

Seward argues that he "would have been 'better off,' from a sentencing perspective, had he murdered R.T." He further argues that "he would have been 'better off' even if he had committed the current crimes, but had then murdered [R.T.] before she disclosed them." Seward asserts that his sex crimes cannot be punished more severely than certain homicides.

This court considered the same arguments in *Woodard*, where the defendant had been convicted of aggravated indecent liberties with a child:

"This argument suffers from several flaws. In the first place, it assumes that murderers necessarily receive more lenient sentences in Kansas than violators of Jessica's Law. This is not the case. In fact, the Kansas Criminal Code sets out a list of transgressions that constitute capital murder, which is an off-grid offense. K.S.A. 21-3439. Capital murder is subject to punishment by death. K.S.A. 21-4624. The penalty for homicide in Kansas may thus be much more severe than the penalties under Jessica's Law. See K.S.A. 21-4638; K.S.A. 21-4643. The fact that the penalty for certain categories of homicide may be less severe than the penalties for other, nonhomicide crimes does not automatically render the penalties for the nonhomicide crimes unconstitutional. There is no strict linear order of criminal activity that ranks all homicides as the most serious crimes and all nonhomicide crimes as less serious, with the corresponding penalties necessarily ranking in diminishing durations of imprisonment.

"Furthermore, as the State points out, Jessica's Law is not the only Kansas statute that provides for more severe penalties for nonhomicide crimes than for

certain categories of homicide. Compare, *e.g.*, rape, K.S.A. 21-3502, and aggravated kidnapping, K.S.A. 21-3420, which are severity level 1 offenses, with reckless second-degree murder, K.S.A. 21-3402(b), which is a severity level 2 offense." *Woodard*, 294 Kan. at 723-24.

In *Woodard*, we concluded that the Jessica's Law penalty for aggravated indecent liberties with a child was not disproportionately harsh when compared with the punishments imposed for other offenses in Kansas. *Woodard*, 294 Kan. at 724. This holds true for the rape and aggravated criminal sodomy for which Seward pleaded guilty; both of these crimes are at least as serious as aggravated indecent liberties.

Also on the second *Freeman* prong, Seward also asks this court to consider the 2008 and 2009 Kansas Sentencing Commission Proportionality Subcommittee's Report on Proposed Improvements and Modifications to Kansas Sentencing Laws. But our review of the report reveals nothing to suggest that Seward's sentence is disproportionately harsh when compared with other Kansas sentences. Moreover, the Kansas Sentencing Commission "consult[s] with and advise[s] the legislature." K.S.A. 2012 Supp. 74-9101(b)(2). When the legislature fails to adopt a recommendation of the Sentencing Commission, it is not for this court to evaluate or criticize. See *Woodard*, 294 Kan. at 726 ("[T]he choice of how this State should best respond to criminal conduct is a legislative, not a judicial, decision.").

Moving to the third prong of the *Freeman* test, this court compares the penalty under Jessica's Law for rape and aggravated criminal .sodomy with the penalties for the same offenses in other jurisdictions. *Freeman*, 223 Kan. at 367.

At this point, another brief clarification of *Woodard* is in order. In that case, we compared the Jessica's Law penalty for aggravated indecent liberties with a child to penalties in other jurisdictions for "similar" offenses rather than the "same" offense. See *Woodard*, 294 Kan. at 725 (citing, *e.g.*, *State v. Berniard*, 860 So. 2d 66 [La. App. 2003] [aggravated rape of adult woman]; comparing penalties for convictions of capital sexual battery, sodomy, rape, aggravated rape, and sexual intercourse without consent); see also *Britt*, 295 Kan. at 1035 (relying on Woodard for "similar crimes" standard).

This apparent broadening of the *Freeman* requirement of a comparison to other jurisdictions' penalties for the "same" offense was not intended, and any drift toward it stops here. See *Freeman*, 223 Kan. at 367 (third prong requires comparison to penalties for "same" crime).

Seward provides an extensive summary of sentences in other jurisdictions and concludes that "the vast majority of states have less severe 'Jessica's Law' provisions than does Kansas." He asserts that the Kansas version of Jessica's Law is one of the "harshest such laws in the nation," relying principally on the fact that Kansas imposes a mandatory life sentence without the possibility for parole for 25 years. Seward does not, however, argue specifically that rape and aggravated criminal sodomy committed by an adult against a child younger than 14—or the conduct underlying such charges—are handled differently in other jurisdictions.

The State, for its part, responds that "several of the states" have imposed maximum sentences, *e.g.*, 100 years, that are "functionally the equivalent to the statute in Kansas." The State does not favor the court with any citations to authority.

This court has already examined and rejected Seward's broad-brush attack on the entire Kansas Jessica's Law sentencing scheme. In *Woodard*, we concluded that it was "not out of line with other jurisdictions." *Woodard*, 294 Kan. at 725. Indeed, we note now that, by Seward's own count, there are 33 jurisdictions in which a life sentence may be imposed for violations of Jessica's Law-type crimes; and Kansas is not the only state requiring a mandatory minimum of actual time served for the specific conduct Seward committed. See Ariz. Rev. Stat. Ann. § 13-705 (2009) (no parole for 35 years for sexual conduct with minor under 13 years old; sexual intercourse, oral sexual contact); Nev. Rev. Stat. Ann. § 200.366 (West 2007) (no parole for 35 years for sexual assault against minor under 16 years old; sexual penetration, oral sexual conduct); Ohio Rev. Code Ann. § 2907.02(A)(1) and (B) (West 2008) (no parole for 25 years for rape of minor under 13 years old; sexual intercourse, oral sexual contact); see also La. Rev. Stat. Ann. § 14:42 (West 2006) (no parole for aggravated rape; anal, oral, vaginal sexual intercourse). In addition, in Montana, where the

crimes at issue here are defined as incest, courts impose an automatic 100 years imprisonment without the possibility for parole for 25 years. Mont. Code Ann. § 45-5-507 (2007). Although medical science continues to advance and to lengthen human life, 100 years obviously is still every bit as long as a life sentence for all but the extraordinarily hardy offender.

We conclude that Kansas does not have the harshest penalties in the nation for the crimes of rape and aggravated criminal sodomy committed by an adult against a child younger than 14. Seward's challenge fails to meet the third prong of *Freeman* as well.

Because none of the three steps of the *Freeman* analysis favors a conclusion that Seward's sentences violate § 9, his case-specific challenge to his life sentences under this state constitutional provision fails.

*Application of the Eighth Amendment Case-Specific Framework to Seward's Case*

Seward combines his § 9 and case-specific Eighth Amendment challenges and suggests that their analyses are "virtually identical." As mentioned, we have acknowledged that analysis of a § 9 challenge under the *Freeman* factors "applies with equal force" to a case-specific Eighth Amendment challenge. *State v. Ross*, 295 Kan. 424, 429, 284 P.3d 309 (2012); *Woodard*, 294 Kan. at 723; see also *State v. Mossman*, 294 Kan. at 922-23 (court proceeds with analysis of Eighth Amendment case-specific challenge even though district judge's factual findings made in context of state constitutional challenge).

In this case, the district judge understood that her task was to "make specific findings pursuant to *State v. Freeman*," but she also concluded that Seward's sentences did not violate the Eighth Amendment. This superficial disconnect does not give us pause, given (1) the similarity between the factors to be evaluated under *Freeman* and those to be evaluated when a case-specific Eighth Amendment challenge is made, and (2) Seward's abandonment of any Eighth Amendment categorical challenge.

On his Eighth Amendment case-specific challenge Seward urges us to focus on the particular facts in the record, but they do not

persuade us that he meets his threshold burden of demonstrating that his sentences are grossly disproportionate to his crimes.

Our decision in *Woodard* is instructive. In that case, we held that defendant Philip Woodard's three hard 25 life sentences under Jessica's Law for aggravated indecent liberties with his twin stepchildren were not grossly disproportionate to his crimes. 294 Kan. at 722. The aggravated indecent liberties charges stemmed from his lewd fondling or touching of the children over the course of 5 years. The children were approximately 7 years old when the activity began. 294 Kan. at 719.

As mentioned before, Seward's crimes and the activity that gave rise to his convictions are at least as serious as those before us in *Woodard*. His victim's age was similar to the victims' ages in Woodard, and the total duration of the abuse was comparable. But rape and aggravated criminal sodomy are substantially more invasive than lewd fondling and can cause greater physical injury. See *State v. Gideon*, 257 Kan. 591, 614, 894 P.2d 850 (1995) (rape, aggravated criminal sodomy extremely invasive). In fact, there was evidence of physical pain and injury to Seward's stepdaughter in this case.

Because a threshold comparison of Seward's crimes and sentences does not lead to an inference of gross disproportionality, we do not address the remaining elements of an Eighth Amendment case-specific analysis. See *Mossman*, 294 Kan. at 925.

*Lifetime Postrelease Supervision*

Finally, we note that the district judge erred by sentencing Seward to lifetime postrelease supervision rather than making him subject only to parole. This portion of Seward's sentence is illegal, see *State v. Cash*, 293 Kan. 326, Syl. ¶ 2, 263 P.3d 786 (2011) (inmate with off-grid indeterminate life sentence can leave prison only if successor to Kansas Parole Board grants parole; sentencing court has no authority to order term of postrelease supervision in conjunction with off-grid indeterminate life sentence); and it may be corrected by us *sua sponte* at any time. See K.S.A. 22-3504; *State v. Gilliland*, 294 Kan. 519, 552, 276 P.3d 165 (2012). We therefore vacate the lifetime postrelease supervision portion of the district

judge's sentencing pronouncement. See *State v. Summers*, 293 Kan. 819, 832, 272 P.3d 1 (2012) (postrelease vacated in similar circumstances).

## CONCLUSION

Because defendant Roy Seward's Jessica's Law hard 25 life sentences for rape and aggravated indecent liberties are not disproportionate to his crime under the Eighth Amendment to the United States Constitution or § 9 of the Bill of Rights of the Kansas Constitution, these sentences are affirmed. Seward is, however, entitled to vacation of the postrelease supervision term ordered by the district judge.

Affirmed in part, reversed in part, and remanded.