No. 104,710

STATE OF KANSAS, *Appellee*, v. ERIC OCHS, *Appellant*.
(306 P.3d 294)

Opinion filed August 16, 2013.

*Joanna Labastida*, of Kansas Appellate Defender Office, argued the cause, and *Shawn E. Minihan*, of the same office, was with her on the brief for appellant.

*Patrick J. Hurley*, assistant district attorney, argued the cause, and *Charles E. Branson*, district attorney, and *Derek Schmidt*, attorney general, were with him on the briefs for appellee.

The opinion of the court was delivered by

NUSS, C.J.: A jury convicted Eric Ochs of the rape of 11-year-old D.T. in violation of K.S.A. 21-3502(a)(2) (sexual intercourse with a child who is under 14 years of age). Because Ochs was older than 17 years, the crime was an off-grid person felony per K.S.A. 21-3502(c). The district court sentenced him to a "hard 25" lifetime prison term under K.S.A. 21-4643(a)(1)(B). He now directly appeals under K.S.A. 22-3601(b).

The issues on appeal, and our accompanying holdings, are as follows:

1. Did the prosecutor commit misconduct during her rebuttal closing argument? Yes, but harmless error.
2. Did Ochs' sentence violate § 9 of the Kansas Constitution Bill of Rights, *i.e.*, cruel or unusual punishment? No.

Consequently, we affirm the district court.

## FACTS

The parents of 11-year-old D.T. spent the night of February 6,

2009, away from their home. Her mother, L.T., asked 21-year-old defendant Eric Ochs and his girlfriend Chelsey Hoyt to watch D.T. and D.T.'s older brother and younger sister. Ochs, L.T., and D.T. all felt Ochs was like a member of the family.

D.T. and her siblings went to bed that night between 9 and 11 o'clock. Ochs and Hoyt stayed up until about 3 a.m. and slept in the family room. At some point, possibly around midnight, Ochs and Hoyt had sex there. At another point Ochs initiated contact with D.T. in her bedroom that led to the State's charges in this case.

### D.T.'s trial testimony

D.T. testified that she went to bed wearing her t-shirt, jeans, and underwear. Ochs later entered her room, told her that "her legs need to breathe," and removed her jeans. Ochs returned a second time and took off her underwear. According to D.T., Ochs "put his finger in my vagina" and later "put his thingy in my vagina." She said that Ochs was on top of her and that he "hump[ed]" her.

D.T. also testified she then pushed her arms out because she was in pain. Ochs left the room saying that "he didn't mean to hurt [D.T.]" According to her, Ochs left her bed wet, and she covered the wet spot with a blanket and went back to bed. D.T. further testified that when she used the bathroom the next morning it hurt to urinate, and she saw blood on the toilet paper.

### Officer Jamie Lawson and KBI officials

Officer Jamie Lawson of the Lawrence Police Department testified that he investigated D.T.'s allegations. Lawson first met with D.T. Instead of verbally responding to Lawson's questions, D.T. wrote many of her answers on several sheets of paper. According to Lawson's testimony, D.T. also wrote a separate letter to the officers detailing the incident.

D.T.'s written responses and letter are largely consistent with her later trial testimony. In each document she explains that Ochs entered her room twice and on the second occasion he removed her underwear, put his finger in her vagina, and then had intercourse with her.

Lawson testified that he later met with Ochs. According to Lawson, Ochs told Lawson that on February 6 he entered D.T.'s room and removed her pants and underwear while she was lying in bed. Lawson said Ochs then told him that he had masturbated next to her bed. Lawson further testified that Ochs said he touched "the split" of D.T.'s vagina and admitted that he had "touch[ed] her on the lips." Per Lawson, Ochs repeated his statements on the way to jail after his arrest.

Lawson's interview with Ochs was recorded and eventually played for the jury. On the recording, Ochs stated that he first walked in and removed D.T.'s pants. And when he took off her pants he saw her vagina and became excited. Per the recording, Ochs said that he simultaneously touched her vagina with one hand and masturbated with the other hand and that he "touched the inside but did not stick [his] fingers in her." He also admitted that he touched "inside the split" but denied sticking his "finger inside the hole."

During the investigation, Lawson retrieved several blankets and sheets from D.T.'s bed. KBI officials testified that some of these items contained traces of mixed DNA which was consistent with "DNA profiles of [D.T.] and Eric [Ochs]." Two blankets also contained sperm. Per the KBI, the sperm's DNA profile "matche[d] the DNA profile of Eric Ochs" so he could not be excluded as the donor. While the KBI official testified that he "can't tell you how that DNA got there," he also said mixed DNA profiles can occur "from a sexual encounter."

*Ochs' trial testimony*

Ochs testified that he entered D.T.'s room around 2 a.m. and removed her jeans so that she would be more comfortable. According to his testimony, his admission to Lawson that he masturbated was not true. Rather, he told Lawson he masturbated on D.T.'s bed because he felt pressured to explain why his DNA was on her bedding.

According to Ochs' testimony, his admission to Lawson that he touched D.T.'s vagina was also untrue. Rather, he told Lawson about this contact because Lawson said if Ochs admitted touching

D.T. he could receive treatment instead of imprisonment. At all times Ochs denied having sexual intercourse with D.T.

*Other evidence*

D.T. takes medication for bipolar disorder and ADHD. Due to behavior problems, she previously had been scheduled to begin treatment at Camelot, a psychiatric residential treatment facility in Wichita, 3 days after Ochs' episode. Her Camelot therapist, Erika Purcell, testified that D.T. was referred there to address a handful of behavior issues including lying, mood swings, and hallucinations. According to Purcell, L.T. told her that D.T. would "fabricate stories and believe that it's true."

D.T. had indeed made a sexual abuse claim against her uncle when she was 5 years old. But she withdrew the allegations the day before his trial. At Ochs' trial she admitted she had lied about the claim against her uncle.

*Closing argument, verdict, and sentencing*

During closing argument, Ochs' attorney, Kevin Babbit, attacked D.T.'s credibility. He referred to D.T.'s prior accusation against her uncle and her testimony admitting she had lied about that event. He also discussed the reasons for her referral to Camelot, *i.e.*, hallucinations and "excessive lying." He further noted that her testimony about other events from that weekend unrelated to the charges, *e.g.*, who accompanied her in the car on the way to Camelot, was inconsistent with the testimony of others. He argued these comments of D.T. were "untrue" and "false."

Assistant District Attorney Amy McGowan then presented her rebuttal argument. McGowan contended that D.T. had "always been consistent about what constitutes the elements of these sex crimes." She later argued:

"And when D.T. was in her room that night, all alone, she was defenseless, she was scared. . . . She was in pain. All those things happened to her in that room. She had no protection at all.

"But, you know, one thing she didn't know is she did have protection. She had something that protected her not only from that room, down at Camelot, and she brought it right here with her into this courtroom, and that protection she had

was the truth. The truth that Eric Ochs had sexual intercourse with her, committed the crime of rape in her room on that night."

These were the final words of counsel before jury deliberations.

The jury rejected the alternative charge of aggravated indecent liberties with a child and convicted Ochs of rape under K.S.A. 21-3502(a)(2), an off-grid person felony. Ochs then filed a motion under K.S.A. 21-4643(d) requesting a durational departure from the minimum sentence of the "hard 25" life sentence mandated under K.S.A. 21-4643(a)(1)(B). He also filed a motion requesting that the court find Jessica's Law, K.S.A. 21-4643, to be cruel or unusual punishment under § 9 of the Kansas Constitution Bill of Rights. The district court denied both motions.

More facts will be added as necessary to the analysis.

## ANALYSIS

Issue 1: *The prosecutor committed misconduct, but the error was harmless.*

Ochs argues the prosecutor committed misconduct in her rebuttal closing argument regarding D.T.'s "protection by the truth" and the error is reversible. The State contends the error, if any, was harmless.

### Standard of review

We have said that review of prosecutorial misconduct claims involves a two-step process. The court first decides whether the comments were outside the wide latitude a prosecutor is allowed, *e.g.*, in discussing the evidence. If so, there was misconduct. Second, if misconduct is found, we have said the court must determine whether the improper comments prejudiced the jury and denied the defendant a fair trial. *State v. Marshall*, 294 Kan. 850, 857, 281 P.3d 1112 (2012).

For years we have considered several factors in analyzing this second step: (1) whether the misconduct was gross and flagrant; (2) whether it was motivated by prosecutorial ill will; and (3) whether the evidence was of such a direct and overwhelming nature that the misconduct would likely have had little weight in the

minds of jurors. None of these three factors has been individually controlling. *Marshall*, 294 Kan. at 857.

Since 2004, this court has also demanded that any prosecutorial misconduct error meet the "dual standard" of both constitutional harmlessness and statutory harmlessness to uphold a conviction. See *State v. Tosh*, 278 Kan. 83, 97, 91 P.3d 1204 (2004) ("Before the third factor can ever override the first two factors, an appellate court must be able to say that both the K.S.A. 60-261 and *Chapman* [*v. California*, 386 U.S. 18, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967),] harmlessness tests have been met.").

We have said that under the constitutional harmless error analysis defined in *Chapman v. California*

"the error may be declared harmless where the party benefitting from the error proves beyond a reasonable doubt that the error complained of will not or did not affect the outcome of the trial in light of the entire record, *i.e.*, where there is no reasonable possibility that the error contributed to the verdict." *State v. Ward*, 292 Kan. 541, Syl. ¶ 6, 256 P.3d 801 (2011), *cert. denied* 132 S. Ct. 1594 (2012).

Under the harmless error analysis defined in K.S.A. 60-261, the test is equally clear. We have said the court "determine[s] if there is a reasonable probability that the error did or will affect the outcome of the trial in light of the entire record." 292 Kan. 541, Syl. ¶ 6.

Under both standards, the party benefiting from the error—here, allegedly the State—bears the burden of demonstrating harmlessness. *State v. Herbel*, 296 Kan. 1101, 299 P.3d 292 (2013). That burden is higher when the error is of constitutional magnitude. See *Herbel*, 296 Kan. at 1109-10 ("Clearly, the party benefiting from the constitutional error must meet a higher standard to show harmlessness than the standard required in nonconstitutional error.").

*Discussion*

Ochs claims the following comments from the prosecutor's rebuttal closing argument were misconduct:

"*But, you know, one thing she didn't know is she did have protection.* She had something that protected her not only from that room, down at Camelot, and she

brought it right here with her into this courtroom, *and that protection she had was the truth. The truth that Eric Ochs had sexual intercourse with her, committed the crime of rape in her room on that night."* (Emphasis added.)

More specifically, Ochs claims the prosecutor improperly testified about D.T.'s truthfulness, bolstered her testimony, and encouraged the jury to convict him merely to protect her.

The State responds that the comments were permissible because the prosecutor (1) was simply asking the jury to consider the evidence and (2) was merely responding to improper comments made by Ochs' attorney. We disagree with both of the State's arguments.

The prosecutor's comments were not an invitation for the jury to consider the evidence. Instead they were a prosecutorial declaration that the State's most important witness—the victim—was telling the truth. We recently rejected a nearly identical argument in *State v. Smith,* 296 Kan. 111, 293 P.3d 669 (2012). There, we held that the "repeated invocation of the 'truth' " during closing argument by the same assistant district attorney who prosecuted Ochs was not a proper comment on the evidence. 296 Kan. at 133.

Ochs' case contains striking parallels to *Smith* because there the prosecutor argued:

"And you know, it is hard work to get to the truth, and there is a lot to sort through. But the truth is there, and the truth is here in this courtroom, *and the truth was presented to you through the course of last week.*

"*And the truth is the only thing that David Boose has right now.* He was alone in his kitchen. He was surprised by these two people trying to take things that were his. He was unprotected, and he was shot. Executed.

"*But today, in this courtroom, he has the truth. And the truth will give him a verdict against Allen Smith for aggravated burglary, and a verdict against Allen Smith for shooting David Boose in the head. Those verdicts won't replace David Boose.* They won't bring him back. They won't fill the hole that is in his family's life, *but they will give us the truth.*" (Emphasis added.) 296 Kan. at 133.

We concluded in *Smith* that "[d]uring closing argument, a prosecutor may not claim sole possession of the 'truth.' Doing so repeatedly is error." 296 Kan. 111, Syl. ¶ 7. Similarly, in *State v. Anderson,* 294 Kan. 450, 463, 276 P.3d 200, *cert. denied* 133 S. Ct. 529 (2012) we held it improper for the prosecutor to argue that the victim is "not defenseless today because he has the criminal justice system with him and he has the truth with him. The truth

will be his redemption here in this courtroom." See also *State v. Elnicki*, 279 Kan. 47, 59-60, 105 P.3d 1222 (2005) (improper comment on the credibility of the State's evidence for the prosecutor to argue "the truth shows you beyond a reasonable doubt the defendant is guilty of the crimes with which he is charged").

As for the State's second argument that the prosecutor was simply responding to Ochs' counsel, we acknowledge his counsel arguably made improper comments as he walked the perilous line between simply pointing out the inconsistencies in D.T.'s testimony and calling her a liar. While he did not expressly call D.T. a liar, he clearly branded some of her testimony "untrue" and "false." See Kansas Rules of Professional Conduct (KRPC) 3.4(e) ("[A] lawyer shall not in trial . . . state a personal opinion as to . . . the credibility of a witness.").

Nevertheless, we recently rejected the State's identical "merely responding" argument in *State v. Marshall*, 294 Kan. at 861. As we clarified there, a facially improper comment by a prosecutor responding to defense counsel's argument is but one factor to consider in the overall calculus; it no longer absolutely rinses off possible misconduct. "The open-the-door rule does not insulate a prosecutor from a finding of misconduct." 294 Kan. at 860. In short, improper defense arguments do not absolve the prosecutor of her obligations. *Elnicki*, 279 Kan. at 60. (" 'Our rules of conduct clearly and unequivocally say that it is improper for a lawyer to comment on a witness' credibility.' ").

Based upon these authorities we conclude that the prosecutor committed misconduct, *i.e.*, her comments were error.

With the prosecutorial misconduct established, we turn to the second analytical step. See *Marshall*, 294 Kan. at 857. This includes determining whether the prosecutor's improper comments were harmless error under the standards of both K.S.A. 60-261 and *Chapman v. California*, 386 U.S. 18.

We recently held that when the constitutional and nonconstitutional error clearly arises from the very same acts and omissions, we logically begin with our harmlessness analysis of the constitutional error. See *Herbel*, 296 Kan. at 1111. We reach this conclusion because if we decide the constitutional error is not harmless

and reverse the convictions, there is no point in analyzing whether the State met the lower standard for harmlessness under K.S.A. 60-261. *Herbel*, 296 Kan. at 1111.

In turning to our constitutional error analysis, we review the factors upon which Ochs relies to argue reversal and remand to the district court. Per *State v. Tosh*, initially these are gross and flagrant conduct and prosecutorial ill will.

In determining whether prosecutorial misconduct was gross and flagrant, among the things we have considered are whether the comments were repeated, emphasized improper points, were planned or calculated, or violated well-established or unequivocal rules. *State v. Brown*, 295 Kan. 181, 214, 284 P.3d 977 (2012). In determining whether prosecutorial misconduct was motivated by ill will, among the things we have considered are whether the conduct was deliberate or in apparent indifference to a court's ruling. *Marshall*, 294 Kan. at 862; see also Gershman, Prosecutorial Misconduct § 14.5, pp. 602-03 (2d ed. 2012) ("Other factors considered by courts in determining harmfulness are whether the prosecutor's misconduct was deliberate, related to a crucial issue in the trial, or was followed by a prosecutorial apology."); *cf.* Prosecutorial Misconduct, § 10:51, p. 458 (a prosecutor's failure to obey court rulings increases the likelihood of reversal). In an overlap with determining gross and flagrant conduct, for determining ill will this court has also considered whether the conduct was repeated. See *Marshall*, 294 Kan. at 862.

This case's unique link with *State v. Smith*, 296 Kan. 111, shows that the comments by Ochs' prosecutor were not only gross and flagrant but also suggestive of ill will. In *Smith*, we described the prosecutor's use of "truth" as a "repeated invocation" during closing argument. 296 Kan. at 133. We concluded the prosecutor's behavior was "perilously close to gross and flagrant and demonstrative of ill will." 296 Kan. at 134.

While here the prosecutor did not repeat the "truth" argument throughout her entire rebuttal, she traced "the truth" from D.T.'s bedroom, to D.T.'s first conversations with her therapist, and all the way through her testimony at trial. "She brought it [the truth] right here with her into this courtroom." And the prosecutor con-

cluded by arguing that the "truth [is] that Eric Ochs had sexual intercourse with her, committed the crime of rape . . . ."

In essence, the prosecutor did not just bolster the victim's testimony but declared that "the truth" virtually mandated a guilty verdict for her rape. See *State v. Raskie*, 293 Kan. 906, Syl. ¶ 3, 269 P.3d 1268 (2012) (closing argument cannot inflame the jury's passions or prejudices or divert the jury from its duty to decide the case based on the evidence and controlling law).

As we recognized in *Smith*, the rule that forbids a prosecutor from claiming the truth is on his or her side is a long-standing one. *Smith*, 296 Kan. at 133 ("Moreover, *Elnicki* was not news on the impropriety of such an invocation."). *Elnicki* was decided in 2005, nearly 5 years before the prosecutor uttered her comments in Ochs' trial. Violation of a long-standing rule is indicative of gross and flagrant conduct. See *Brown*, 295 Kan. 181.

Additionally, the close parallels between the language used by the same prosecutor—in Ochs' case and in *Smith*—suggest that her closing comments here were not extemporaneous. See also *State v. Anderson*, 294 Kan. at 464 (holding that it was a close call whether the same prosecutor's similar "truth" comments in closing argument, *e.g.*, "the truth will be his redemption here in this courtroom" were gross or flagrant or demonstrated ill will). In short, similar closing arguments have been used by the same prosecutor in at least three jury trials resulting in convictions appealed to this court the last few years. Their continual use by her after *Elnicki* causes us to seriously doubt prosecutorial inadvertence or spontaneity and to instead approach deliberateness. Deliberate misconduct is indicative of ill will. See *Marshall*, 294 Kan. at 862.

In continuing our constitutional harmlessness analysis, we address Ochs' ultimate argument that the misconduct affected the minds of the jury and therefore requires reversal and remand. The State essentially responds that there is no reasonable possibility the misconduct contributed to the verdict. See *State v. Ward*, 292 Kan. 541, Syl. ¶ 6, 256 P.3d 801 (2011).

We begin by acknowledging Ochs frames his case as a credibility contest. He argues that the jury had two options: to believe him or to believe D.T. And we further acknowledge that during closing

argument, Ochs' attorney highlighted some discrepancies in D.T.'s testimony.

But no D.T. discrepancies were related to her allegations against Ochs. The prosecutor accurately argued in closing that D.T. had been consistent about the sex-related events of that night.

Ochs, on the other hand, substantially changed his story at trial. He testified that he had fabricated two of his critical admissions to Lawson: (1) while masturbating near her bed (2) he had touched the "inside" or "inside the split" of D.T.'s vagina. He denied any masturbation and any touching whatsoever of her vagina. Additionally, the DNA evidence buttresses D.T.'s testimony about her sexual contact with Ochs. The DNA profile of the sperm on her blankets matched his profile, and the bedding contained traces of mixed DNA consistent with the profiles of both Ochs and D.T.

When we balance the prejudice created by the prosecutor's comments against the amount of this evidence and Ochs' changing stories, we conclude that the misconduct was harmless error. Stated another way, the State has met its burden of proving "beyond a reasonable doubt that the error complained of . . . did not affect the outcome of the trial in light of the entire record, *i.e.,* . . . there is no reasonable possibility that the error contributed to the verdict." See *Ward,* 292 Kan. 541, Syl. ¶ 6. Given this holding, we need not determine whether the State has met its burden of showing harmless error under the lower standard articulated in K.S.A. 60-261. *Herbel,* 296 Kan. at 1110-11.

Issue 2: *Ochs' sentence does not violate § 9 of the Kansas Constitution Bill of Rights.*

Ochs asks that his hard 25 sentence be vacated and the matter be remanded for resentencing because of constitutional violations. While his appellate brief captions this sentencing issue as a violation of his right under the Eighth Amendment to the United States Constitution to be free from a cruel and unusual punishment, his entire argument and analysis is limited to alleging a violation of his right to be free from cruel or unusual punishment under § 9 of the Kansas Constitution Bill of Rights. So we will deal exclusively with § 9. See *State v. Mattox,* 280 Kan. 473, 492, 124 P.3d 6 (2005) ("A

point raised only incidentally in a party's brief but not argued in the brief is deemed abandoned.").

Earlier this year we held that the Jessica's Law sentencing scheme under K.S.A. 21-4643(a)(1)(B) (rape) survives § 9 constitutional scrutiny. *State v. Seward,* 296 Kan. 979, 297 P.3d 272 (2013). We affirmed this holding in *State v. Newcomb,* 296 Kan. 1012, 298 P.3d 285 (2013). The *Seward* and *Newcomb* defendants—like Ochs—were convicted of rape of a child under 14 years of age, sentenced under the same statute, and received the same sentence—a hard 25. We begin our review against this backdrop.

### Standard of review

Recently, we reiterated the standard of review for § 9 constitutional challenges.

"In determining whether a sentence is cruel or unusual, a district court must make both legal and factual inquiries. See, *e.g.*, *State v. Ortega-Cadelan,* 287 Kan. 157, 160-61, 194 P.3d 1195 (2008). These inquiries invoke a bifurcated standard of review: without reweighing the evidence, the appellate court reviews the factual underpinnings of the district court's findings under a substantial competent evidence standard, and the district court's ultimate legal conclusion drawn from those facts is reviewed de novo. *State v. Gant,* 288 Kan. 76, 80, 201 P.3d 673 (2009); *State v. Woolverton,* 284 Kan. 59, 70, 159 P.3d 985 (2007).

"A statute is presumed constitutional and all doubts must be resolved in favor of its validity. If there is any reasonable way to construe a statute as constitutionally valid, the court has the authority and the duty to do so. *State v. Laturner,* 289 Kan. 727, 735, 218 P.3d 23 (2009); see also *State ex rel. Six v. Kansas Lottery,* 286 Kan. 557, 562, 186 P.3d 183 (2008) ('It is not the duty of this court to criticize the legislature or to substitute its view on economic or social policy; it is the duty of this court to safeguard the constitution.')." *State v. Woodard,* 294 Kan. 717, 720, 280 P.3d 203 (2012).

### Discussion

Section 9 of the Kansas Constitution Bill of Rights provides:

"All persons shall be bailable by sufficient sureties except for capital offenses, where proof is evident or the presumption great. Excessive bail shall not be required, nor excessive fines imposed, nor cruel or unusual punishment inflicted."

We elaborated on the infliction of cruel or unusual punishment prohibited by § 9 in *Seward,* 296 Kan. at 982:

" 'Under § 9 of the Kansas Constitution Bill of Rights, a punishment may be constitutionally impermissible, although not cruel or unusual in its method, if it is so disproportionate to the crime for which it is inflicted that it shocks the conscience and offends fundamental notions of human dignity.' *State v. Gomez,* 290 Kan. 858, Syl. ¶ 9, 235 P.3d 1203 (2010). Whether a sentence is 'cruel or unusual' under § 9 because of its length is controlled by a three-part test, first outlined in *State v. Freeman,* 223 Kan. 362, 367, 574 P.2d 950 (1978). This three-part test weighs the following:

'(1) The nature of the offense and the character of the offender should be examined with particular regard to the degree of danger present to society; relevant to this inquiry are the facts of the crime, the violent or nonviolent nature of the offense, the extent of culpability for the injury resulting, and the penological purposes of the prescribed punishment;

'(2) A comparison of the punishment with punishments imposed in this jurisdiction for more serious offenses, and if among them are found more serious crimes punished less severely than the offense in question the challenged penalty is to that extent suspect; and

'(3) A comparison of the penalty with punishments in other jurisdictions for the same offense.' [Citation omitted.]

No single factor under the *Freeman* test controls the outcome. *State v. Berriozabal,* 291 Kan. 568, 591, 243 P.3d 352 (2010)."

" 'Ultimately, one consideration may weigh so heavy that it directs the final conclusion,' but 'consideration should be given to each prong of the test.' " *Woodard,* 294 Kan. at 723 (quoting *State v. Ortega-Cadelan,* 287 Kan. 157, 161, 194 P.3d 1195 [2008]). The first *Freeman* factor is " 'inherently factual, requiring examination of the facts of the crime and the particular characteristics of the defendant,' " while the two remaining factors depend solely upon "legal determinations." *State v. Seward,* 289 Kan. 715, 719, 217 P.3d 443 (2009); see *State v. Freeman,* 223 Kan. 362, 367, 574 P.2d 950 (1978).

*The first* Freeman *prong:*

The first prong of the *Freeman* three-part test requires us to consider the nature of the offense and the character of the offender in light of the facts of the crime. *Seward,* 296 Kan. at 986 (citing *State v. Britt,* 295 Kan. 1018, 1033, 287 P.3d 905 [2012]).

In response to Ochs' motion requesting determination that his sentence was unconstitutional, among other things the district court found that D.T. was placed in Ochs' care, custody, and con-

trol and he was responsible for babysitting her while her parents were gone. It also found the testimony at trial showed a special relationship between Ochs and D.T.'s mother, *i.e.*, mother-son. The court even acknowledged that Ochs had had a difficult childhood. These findings are supported by substantial competent evidence in the record.

Ochs testified that his mother committed suicide on his 14th birthday and he never knew his father. He stated that he suffered sexual abuse before the age of 5 from peers and other caretakers. Ochs also said that he had previously been diagnosed with bipolar disorder.

The record also reflects Ochs was well aware of the trust placed in him by D.T.'s family, as contained in the district court findings. L.T. testified that Ochs was like a son to her, D.T. testified that Ochs was like a brother to her, and Ochs himself said he was like part of the family. So like the defendants in *Woodard, Seward,* and *Newcomb,* Ochs "enjoyed a special position of trust" with the victim. *Woodard,* 294 Kan. at 721 (abuser was victim's stepfather); *Seward,* 296 Kan. 979 (stepfather); *Newcomb,* 296 Kan. 1012 (stepfather). And D.T.'s rape occurred at the hands of this family member while he was occupying an additional position of trust as her babysitter.

Similar to the defendant in *Newcomb,* 296 Kan. at 1017, Ochs does not dispute any of these matters but mainly argues that his crime was not particularly violent. More specifically, similar to the *Newcomb* defendant, he alleges there is no evidence D.T. suffered any physical injuries as a result of the crime or that he used a weapon of any kind. But as we held in *Seward* and *Newcomb,* rape itself is a violent offense. See K.S.A. 22-3717(d)(2) (classifying rape under K.S.A. 21-3502 as a "sexually violent crime"). And as we held in *Newcomb,* the rape of a child under 14 is a crime of "extreme sexual violence" under K.S.A. 21-4716(c)(2)(F)(i)(c).

Additionally, D.T. testified that the sex act itself was painful and she suffered physical injury. She testified that it hurt to urinate the next day and that she discharged blood in the bathroom. Furthermore, D.T. was a vulnerable victim. She was in need of psychiatric or psychological treatment even before the incident, and her

mother testified at sentencing that the sexual abuse caused D.T.'s problems to get "worse," and that their "family is falling apart."

As for Ochs' second argument—that he did not use a weapon—we rejected a similar contention in *Seward*.

"Regarding the degree of violence attendant to the offenses, Seward argues that the 'State did not present evidence that [he] used a weapon to commit the crimes, that he kidnapped or otherwise terrorized R.T.' But this argument does not undercut the sexual violence of rape and aggravated criminal sodomy. Simply because Seward could have committed these acts more violently does not mean they are not violent in their most basic form, particularly when committed against an especially vulnerable victim." 296 Kan. at 986.

See also *Newcomb*, 296 Kan. at 1018 ("That a sexually violent crime could have been committed more violently is legally insignificant.").

So under these circumstances, we conclude the first prong of the *Freeman* analysis does not favor Ochs' argument that his Jessica's Law sentence for rape is unconstitutional under § 9.

*The second* Freeman *prong:*

Under the second prong of the *Freeman* analysis, this court compares Ochs' sentence for rape with the penalties imposed for "more serious crimes" in Kansas. *Seward*, 296 Kan. at 987 (citing *Freeman*, 223 Kan. at 367).

In support, Ochs presents a familiar argument: he would be better off if he would have murdered D.T. instead of raping her. Specifically, Ochs argues that had he been convicted of second-degree intentional murder, he would only face a 267-month sentence under K.S.A. 21-3402(a). Ochs further notes that a conviction for first-degree murder would result in the same hard 25 sentence that he is currently serving.

This court has rejected this argument several times, with the first rejection in *Woodard* in the context of aggravated indecent liberties with a child:

"This argument suffers from several flaws. In the first place, it assumes that murderers necessarily receive more lenient sentences in Kansas than violators of Jessica's Law. This is not the case. In fact, the Kansas Criminal Code sets out a list of transgressions that constitute capital murder, which is an off-grid offense. K.S.A. 21-3439. Capital murder is subject to punishment by death. K.S.A. 21-

4624. The penalty for homicide in Kansas may thus be much more severe than the penalties under Jessica's Law. See K.S.A. 21-4638; K.S.A. 21-4643. The fact that the penalty for certain categories of homicide may be less severe than the penalties for other, nonhomicide crimes does not automatically render the penalties for the nonhomicide crimes unconstitutional. There is no strict linear order of criminal activity that ranks all homicides as the most serious crimes and all nonhomicide crimes as less serious, with the corresponding penalties necessarily ranking in diminishing durations of imprisonment.

"Furthermore . . . Jessica's Law is not the only Kansas statute that provides for more severe penalties for nonhomicide crimes than for certain categories of homicide. Compare, *e.g.*, rape, K.S.A. 21-3502, and aggravated kidnapping, K.S.A. 21-3420, which are severity level 1 offenses, with reckless second-degree murder, K.S.A. 21-3402(b), which is a severity level 2 offense." *Woodard*, 294 Kan. at 723-24.

In *Seward*, 296 Kan. at 988, we recognized the court's conclusion in *Woodard* that the penalty for aggravated indecent liberties was not disproportionately harsh. So we readily concluded that the penalties for rape and aggravated criminal sodomy—both of which are at least as serious as aggravated indecent liberties—were also not disproportionately harsh. See also *Newcomb*, 296 Kan. at 1018-19 (holding *Seward* controls and stating that rape is "undeniably a more invasive and serious crime than aggravated indecent liberties," and thus the penalty for rape is not disproportionately harsh when compared with Kansas sentences for homicide offenses).

We remain unpersuaded by this argument repeated by Ochs. So it again fails under the second prong of the *Freeman* analysis.

*The third* Freeman *prong:*

Under the third prong of the *Freeman* test, this court compares the penalty under Jessica's law for rape with the penalty for the same offenses in other jurisdictions. *Seward*, 296 Kan. at 988 (citing *Freeman*, 223 Kan. at 367).

In support, Ochs argues that Kansas' Jessica's Law sets out one of the nation's harshest penalties for child rape. In *Woodard*, we surveyed the national statutory landscape and concluded that this state's Jessica's Law "sentencing scheme is not out of line with other jurisdictions." 294 Kan. at 725; see *Seward*, 296 Kan. at 989.

In *Seward*, we again surveyed the national landscape and concluded that "Kansas does not have the harshest penalties in the

nation for the crime[ ] of rape . . . committed by an adult against a child younger than 14." *Seward*, 296 Kan. at 989-90. As in *Newcomb*, "no productive purposes would be served by repeating that discussion here." 296 Kan. at 1019. Accordingly, Ochs' argument also fails under this third *Freeman* prong.

In short, none of the three steps of the *Freeman* analysis favors a conclusion that the hard 25 life sentence Ochs received for the rape of 11-year-old D.T. is disproportional and therefore violative of § 9 of the Kansas Constitution Bill of Rights.

The judgment of the district court is affirmed.