NOT DESIGNATED FOR PUBLICATION

No. 115,346

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

BASIL SCOTT MCNELLY,
*Appellant*.

MEMORANDUM OPINION

Appeal from Saline District Court; JARED B. JOHNSON, judge. Opinion filed June 2, 2017. Affirmed.

*Peter Maharry*, of Kansas Appellate Defender Office, for appellant.

*Christina Trocheck*, special assistant county attorney, *Ellen Mitchell*, county attorney, and *Derek Schmidt*, attorney general, for appellee.

Before SCHROEDER, P.J., GREEN, J., and BURGESS, S.J.

*Per Curiam*: Basil Scott McNelly was charged in a 16 count complaint or information following allegations of sexual abuse. Before trial, McNelly entered a plea of nolo contendere to one count of rape under K.S.A. 2013 Supp. 21-5503(a)(3) and (b)(2). Before he was sentenced, McNelly attempted to withdraw his plea. His motion to withdraw his plea was denied, and he was sentenced to a hard 25 year life sentence under Jessica's Law. He was also sentenced to lifetime postrelease supervision and lifetime registration under the Kansas Offender Registration Act (KORA). On appeal McNelly argues (1) that the trial court erred in denying his motion to withdraw his plea; (2) that his

1

life sentence for rape is unconstitutional under Section 9 of the Kansas Constitution Bill of Rights and the Eighth Amendment to the United States Constitution; and (3) that lifetime registration under KORA is unconstitutional under Section 9 of the Kansas Constitution Bill of Rights and the Eighth Amendment to the United States Constitution. Finding his arguments unpersuasive, we hold that the trial court properly denied McNelly's motion to withdraw his plea, and we affirm his sentence for one count of rape under K.S.A. 2013 Supp. 21-5503(a)(3) and (b)(2).

On October 6, 2014, McNelly was charged in a seven count complaint or information. That complaint or information was amended on April 6, 2015, and again on July 10, 2015. In its final form, the complaint or information contained 16 counts—one count of rape; eight counts of aggravated indecent liberties with a child; two counts of aggravated criminal sodomy; three counts of aggravated indecent solicitation of a child; and two counts of lewd and lascivious behavior. The charges were filed as a result of several allegations of sexual abuse against McNelly that were made by his then 10-year-old daughter, E.M.

On July 6, 2015, McNelly moved to dismiss his appointed trial counsel, Julie Effenbeck. In support of his motion, McNelly asserted (1) that Effenbeck failed to file motions on his behalf; (2) that Effenbeck had not discussed his case with him other than at their initial interview; (3) that Effenbeck had not followed his requests at his preliminary hearing; (4) that Effenbeck had not contacted any witnesses to aid in his defense; and (5) that Effenbeck had failed to send him all discovery related to his case. On July 7, 2015, the trial court held a hearing on McNelly's motion to dismiss counsel. The trial judge asked McNelly for the basis of his motion, and McNelly stated:

> "Just I don't feel I'm being represented.
>
> . . . .

2

"I just—she hasn't discussed the case with me, discussing anything with me. I don't feel as though we're ready for trial."

In response to those allegations, Effenbeck addressed the trial court:

"Your honor, we've had discussions about the case. He has copies of all of the police reports, we had actually extensive discussion on March 2nd, I'm looking at a letter I sent to him afterwards, I tried to advise him about a lot of the pitfalls in his case. He insisted he wanted an attorney that had won one of these sexual assault cases. I told him, I indicated I wasn't sure in Saline County who has prevailed in one of these cases, at least to my knowledge recently. We have discussed this case several times, Your Honor, at length. If Mr. McNelly would like to have a new attorney, I'm certainly not going to object to that, Your Honor, but we have discussed the case.

"As far as witnesses, the only witnesses he really would want to pose would be ones to discredit Lori McNelly, which I'm not sure for some of the reasons that that would even be, and I think I would have an opportunity to determine what would be relevant and not relevant as far as that goes, Your Honor."

The trial court reviewed McNelly's motion and the arguments presented at the hearing and denied his motion. In denying the motion, the court stated:

"Although you may have some concerns, the Court believes that the appropriate way to address those is to discuss those with Ms. Effenbeck and resolve the issue. I don't hear any reason that would give the Court cause to justify removal of Ms. Effenbeck, and she's indicated, in so many words, that she's prepared for trial . . . ."

On July 15, 2015, McNelly was scheduled for a jury trial. Instead, a tender of plea was entered with the trial court. Among other items acknowledged and agreed to, McNelly stated that his attorney had represented him adequately and to his satisfaction. He also stated that his attorney had advised him on the nature of the charges and all possible defenses in the case. Most importantly, McNelly acknowledged that he had

3

"been informed that by entering into this plea agreement the Court could sentence me as follows:

"As part of the plea agreement, I will be pleading to one count of Rape, an off-grid felony. The possible penalty is twenty five years to life in prison. There could be a fine of up to $500,000 and there would be lifetime post-release. I would also have to register for list as an Offender.

. . . .

"There have been plea negotiations that bring about this plea, which consist of the following:

"In the present case I will plead to count one of the second amended information—Rape, an off grid felony. The State will dismiss the balance of the charges. The State agrees to open sentencing and I will be able to file a Motion for a Downward Durational Departure and I can ask the Court to depart to the sentencing grid. Additionally, the State agrees that it will not refile the child abuse charges concerning [C.M.], that were previously dismissed. The State also agrees not to refer any incidents to any other counties for prosecution against me."

The trial judge went through the tender of plea form with McNelly. The trial judge noted that the purpose of going through the form was "to ensure that [McNelly was] making a knowing, voluntary decision, that it's of [his] own free will and that it's made intelligently." The trial judge worked through the tender of plea form and asked McNelly about each "statement" contained therein. McNelly affirmed the statements. Particularly relevant to the current appeal, McNelly acknowledged that he had discussed the nature of the charges and the plea with his attorney; and that he understood the possible sentence he was facing.

As part of the tender of plea, McNelly's counsel certified (1) that she had read to McNelly the allegations in the information or complaint and explained to him the elements of each charge and the possible sentence that could be imposed for convictions on the charges he would plead to; (2) that she believed McNelly was competent to

4

understand, and did in fact understand, the charges against him and the consequences of the plea; (3) that to the best of her knowledge and belief, McNelly's statements in the tender of plea form were true; (4) *that she had made no promises to McNelly regarding any sentence that the Court may impose*; and (5) that she had discussed the contents of the tender of plea form and assisted him in completing it.

The trial court accepted McNelly's plea of no contest to one count of rape under K.S.A. 2013 Supp. 21-5503(a)(3) and (b)(2). The trial court's order noted that it had inquired of McNelly and his counsel in open court. The order also noted that the court told McNelly the maximum penalty that could be imposed if the plea were accepted. Finally, after taking statements from McNelly and his counsel, reviewing the file, and being advised on the matter, the court found (1) that McNelly had entered his plea voluntarily and under no threat or promise; (2) that McNelly understood the charge and the plea that he was entering on that charge; (3) that McNelly understood the consequences of the plea he was entering; and (4) that there was a factual basis for the charge to which McNelly was entering his plea. Accordingly, the trial court accepted McNelly's plea.

On September 21, 2015, the trial court held a sentencing hearing. The first matter taken up at that hearing was a motion to withdraw as counsel filed by Effenbeck. Effenbeck told the trial court that she had received a letter from McNelly on September 1, 2015, in which McNelly told her that he wished to withdraw his plea. According to Effenbeck, McNelly also told her that he had information on another one of her clients, and so he wished to change attorneys. Effenbeck asked the court to allow her to withdraw as McNelly's counsel because she was concerned that she would be required to be a witness against herself relating to McNelly's motion to withdraw his plea. The court denied Effenbeck's motion to withdraw as McNelly's counsel and continued sentencing to a later date.

5

On September 25, 2015, McNelly moved to withdraw his plea. This motion was signed by McNelly's counsel, but it did not advance any specific arguments. On October 7, 2015, McNelly wrote the trial court personally and expressed his desire to withdraw his plea. In his letter, McNelly alleged that he took the plea because his attorney told him on the day of his trial that she could not do anything to help him and so the plea was in his best interest. On October 8, 2015, the trial court held a hearing on McNelly's motion to withdraw his plea. At that hearing the court allowed Effenbeck to withdraw as McNelly's counsel. The court appointed McNelly new counsel and set McNelly's motion to withdraw his plea for an evidentiary hearing.

On October 27, 2015, McNelly moved for a departure sentence. On November 6, 2015, McNelly moved to declare his life sentence unconstitutional; moved to declare lifetime postrelease supervision unconstitutional; moved for a dispositional departure; and moved to declare lifetime registration under the Kansas Offender Registration Act (KORA) unconstitutional.

On November 10, 2015, the trial court took up the aforementioned motions. The trial court conducted an evidentiary hearing on McNelly's motion to withdraw his plea. McNelly testified that he understood the plea to mean that he was "accepting a plea for 25 to life with a downward departure, half a sentence . . . [that] it would be . . . agreed upon with the prosecution for half the sentence of that and registration." McNelly acknowledged that nothing in his plea agreement promised that he would receive half of the hard 25-year life sentence. Still, he claimed that Effenbeck explained to him that a departure meant he would only receive half of the sentence or 12.5 years. When asked what happened before he took the plea, McNelly testified that

"Effenbeck came in . . . and said that [the prosecutor] had offered 25 to life . . . it was my best interest to take the plea because she had no defense, she had worked three hours the night before and had not came up with any kind of defense for this case and she did not

6

feel that she was going to win the case at all. Uh, that, you know, if I had any intentions of spending time with my family it would probably be my best interest to take the plea."

McNelly also testified that he was under the impression that he could withdraw his plea at any time up until sentencing. He told the court that he got that notion from "[s]everal other inmates in the jailhouse." McNelly also acknowledged that at the hearing on his plea, the trial court made it clear that he did not have to take the plea and that the jury was scheduled to sit for his trial on that same day. McNelly had a difficult time recalling the details of the plea hearing, but he did recall that the trial court offered to give him additional time to think about his plea before entering it. McNelly argued that there was no benefit to the plea deal because he would be 69 years old when he became eligible for parole, which to him meant that he would spend the rest of his life in prison. He also argued that his plea should be set aside because Effenbeck's "performance fell below the standard of reasonableness."

Effenbeck was also called as a witness at the hearing on McNelly's motion to withdraw his plea. Effenbeck testified that the prosecutor never agreed to a departure to half of a 25-year life sentence. She also testified that there was never any discussion that McNelly would get sentenced to half of the mandatory minimum 25-years' imprisonment. Effenbeck told the court that she did not make any promises to McNelly other than those contained in the tender of plea form. She also testified that after the general terms of the plea were laid out, she left the courthouse to type up the formal tender of plea. When she returned, she went over the form with McNelly. She told the court that had McNelly hesitated in signing the plea agreement, she would have stopped him.

After hearing arguments, the trial court found that Effenbeck was competent. In making this finding, the trial court relied on a letter that Effenbeck had written to McNelly after their initial consultation—the letter detailed the realities of the charges McNelly was facing. The court also noted that Effenbeck was an experienced attorney

7

with specific experience in Jessica's Law cases. The court found that Effenbeck had provided McNelly with effective assistance of counsel. The court then found that McNelly had "made a knowing and voluntary decision to enter his plea." In making this finding, the trial judge noted that he had presided over the case since its inception. The court denied McNelly's motion to withdraw plea, stating that he was experiencing "buyer's remorse and that is not the basis to withdraw a plea."

On November 10, 2015, the trial court also denied his motion to declare lifetime registration under KORA unconstitutional; denied his motion for departure sentencing; and denied his motion for dispositional departure. The court then sentenced McNelly for a child sex offense under K.S.A. 2013 Supp. 21-6627. He was given a hard-25-year life sentence on his plea of nolo contendere to one count of rape under K.S.A. 2013 Supp. 21-5503(a)(3) and (b)(2). He was also given lifetime postrelease supervision and was required to register under KORA for the duration of his lifetime because of his status as a sex offender.

*Did the Trial Court Err in Denying McNelly's Motion to Withdraw His Plea?*

"A plea of guilty or nolo contendere, for good cause shown and within the discretion of the court, may be withdrawn at any time before sentence is adjudged." K.S.A. 2015 Supp. 22-3210(d)(1). An appellate court reviewing a presentence motion to withdraw plea will determine whether the defendant has shown the "good cause" required under K.S.A. 2015 Supp. 22-3210(d)(1). In making this determination, the appellate court will be guided by the following three factors: "(1) whether the defendant was represented by competent counsel; (2) whether the defendant was misled, coerced, mistreated, or unfairly taken advantage of; and (3) whether the plea was fairly and understandingly made." *State v. Fritz*, 299 Kan. 153, 154, 321 P.3d 763 (2014) (citing *State v. Aguilar*, 290 Kan. 506, 511, 231 P.3d 563 [2010]). But these factors should not be applied mechanically or to the exclusion of other factors. *Fritz*, 299 Kan. at 154.

The defendant has the burden to show on appeal that the trial court abused its discretion in denying his or her presentence motion to withdraw plea. *State v. Kenney*, 299 Kan. 389, 393, 323 P.3d 1288 (2014). "Judicial discretion can be abused in three ways: (1) if no reasonable person would have taken the view adopted by the trial court; (2) if the judicial action is based on an error of law; or (3) if the judicial action is based on an error of fact." *State v. Marshall*, 303 Kan. 438, 445, 362 P.3d 587 (2015) (quoting *State v. Mosher,* 299 Kan. 1, 3, 319 P.3d 1253 [2014]).

McNelly argues that the trial court erred in denying his motion to withdraw his plea because he understood the plea to mean that he would only be sentenced to 12.5 years' imprisonment. He also asserts that he was not represented by competent counsel. In his own words, McNelly claims that he "was misled about the ramifications of the plea and did not have competent counsel to fully explain those ramifications." Accordingly, McNelly argues that "this Court must reverse this matter with orders to the district court to allow [him] to withdraw his plea."

The State counters, arguing that McNelly was represented by competent counsel. The State also asserts that "there is nothing in the record to support a conclusion that defendant was misled, coerced, mistreated, or unfairly taken advantage of, and his plea was fairly and understandingly made in this case." The State noted that "[t]he district court was very careful in conducting the plea hearing to ensure that the defendant understood the rights he was waiving by entering a plea and whether the defendant's plea was freely and voluntarily made."

*Was McNelly Represented by Competent Counsel?*

First, McNelly argues that he was not represented by competent counsel because the plea had no benefit. He focuses his argument on the fact that he will be 69 years old

9

when he becomes eligible for parole. Thus, he asserts that he was not represented by competent counsel.

Those assertions ignore the fact that McNelly was facing a 16 count complaint or information. Under his plea, he ended up pleading guilty to only one count of rape. Facing such a robust complaint or information, there was a very real possibility that McNelly would receive multiple life sentences. See *State v. Spear*, 297 Kan. 780, 804, 304 P.3d 1246 (2013) (defendant charged with ten counts of aggravated indecent liberties with a child given two life sentences); *State v. Seward*, 296 Kan. 979, 992, 297 P.3d 272 (2013) (defendant charged with two counts of rape and six counts of aggravated criminal sodomy given two life sentences); *State v. Woodard*, 294 Kan. 717, 719, 280 P.3d 203 (2012) (defendant charged with three counts of indecent liberties with a child given three life sentences). Even though the sentences from these cited cases ran concurrent to one another, McNelly cannot say that he received no benefit relating to his sentence. Surely the likelihood of receiving parole at 25 years goes down as the number of life sentences goes up.

Moreover, McNelly's trial counsel was competent enough to bargain for benefits above and beyond limiting his conviction to one count of rape. The tender of plea form that McNelly signed and submitted to the court read in part:

"There have been plea negotiations that bring about this plea, which consist of the following:

"In the present case I will plead to one count of the second amended information—Rape, an off grid felony. The State will dismiss the balance of the charges. The State agrees to open sentencing and I will be able to file a Motion for a Downward Durational Departure and I can ask the Court to depart to the sentencing grid. Additionally, the State agrees that it will not refile the child abuse charges concerning [C.M.], that were previously dismissed. The State also agrees not to refer any incidents to any other counties for prosecution against me."

10

Thus, it is clear from the language of the plea that Effenbeck obtained many benefits on McNelly's behalf. Condensed, those benefits include (1) getting the State to drop 15 other pending charges against McNelly; (2) limiting his maximum possible sentence to one hard 25 year life sentence, ensuring that he would be eligible for release after 25 years; (3) getting the State to agree to open sentencing, thereby making a departure sentence possible; (4) getting the State to agree to not refile previously dismissed charges; and (5) getting the State to agree not to refer any incidents to other counties for prosecution.

For those reasons, McNelly's argument that Effenbeck was not competent because he received no benefit from the plea fails. It is clear from the language of the plea and the practical consequences of its contents that McNelly received many benefits from entering his plea.

Next, McNelly challenges Effenbeck's competency by arguing that "she did not file any motions for an evaluation of anyone, never hired a private investigator and she only spoke with him a handful of times." He claims that "[o]verall, little was done by Effenbeck in this matter and instead simply told [him] there was no defense."

But McNelly's concerns are not so concerning when viewed in light of the trial court's findings relating to Effenbeck's competency. The trial court appropriately addressed McNelly's concerns when he argued them below. In acknowledging his concerns, the trial court stated:

> "The question of whether Ms. Effenbeck is competent counsel. She is competent. She has tried these cases previously, represented many difficult – factually difficult cases, clients, factually difficult cases, high level felony cases. [The letter she sent McNelly after their initial consultation] reflects in this Court's view a – the work of a counsel who's experienced, understands the difficulties in these types of cases, from the defense bar, and the ability as a competent counsel to earnestly and frankly address that with her client.

11

This Court would be remiss to appoint any attorney that would not paint a realistic picture for their client, the reality after review of evidence and the potential outcome in a case and leave that client in the lurch and miss out on an opportunity for a more beneficial plea deal because they were not realistic with that client. That letter is a reflection of that realism, generally speaking, from the history of these type of cases. She is experienced in trials, she's experienced specifically in this area of law. Nothing that has been presented to this Court would indicate that she is not competent, nor that she acted in any fashion other than as a competent counsel in this case."

The trial court also acknowledged that Effenbeck's decision not to file certain motions did not raise concern as "motions should not be a fishing expedition. . . . [T]he defense bar should not ever file a motion without a basis in the record and their review of the case through interviews or other evidence to file such a motion." The trial court similarly addressed Effenbeck's decision not to hire a private investigator, finding that "[t]here has to be some basis for her to request that. It's not requested in every case, nor would it be approved in every case."

Finally, McNelly argues that he "was not adequately informed of the specifics of the plea agreement. His counsel at the time failed to convey to him one of the basics [*sic*] components of the plea agreement: what sentence he would receive." Thus, McNelly asserts that "[w]ith being misinformed as to the sentence he faced, [he] was not represented by competent counsel."

Again, McNelly's assertions are not supported by the record other than his own testimony at the hearing on the motion to withdraw his plea. The court heard Effenbeck's testimony that she did not ever communicate to McNelly that he would be given half of a 25-year sentence. Furthermore, the trial judge went over the plea meticulously with McNelly before it was accepted. The trial judge who accepted McNelly's plea was the same judge who presided over the proceedings on the motion to withdraw the plea. Thus, the judge had personally asked McNelly whether he understood the possible sentence

12

associated with a nolo contendere plea to rape. McNelly answered in the affirmative in each of those situations. Moreover, McNelly had the following exchange with the trial court at the hearing on the acceptance of his plea.

> "The Court: Have you had enough time to speak with your attorney about this case?
> "The Defendant: Yes.
> "The Court: Are you satisfied with advice and counsel?
> "The Defendant: Yes.
> "The Court: There were some discussions previously about your attorney and asking me to appoint new counsel. I went over those with you and this morning are you telling me that you're satisfied with her representation, you don't wish to have new counsel and you want to proceed with this plea?
> "The Defendant: Yes."

Accordingly, McNelly's argument that his possible sentence was not explained to him cannot stand. The trial court was careful to establish that McNelly was satisfied with Effenbeck as counsel. When coupled with Effenbeck's testimony that she explained to McNelly the possible consequence of his sentence, we cannot say that she did not competently serve McNelly's interest.

After holding an evidentiary hearing on McNelly's motion to withdraw his plea, the trial court concluded that it had "heard nothing but evidence that a defense counsel was prepared." This conclusion is supported by the record on appeal. Thus, this factor does not weigh in McNelly's favor and does not show that the trial court abused its discretion.

*Was McNelly Misled, Coerced, Mistreated, or Unfairly Taken Advantage of and was the*
*Plea Fairly and Understandingly Made?*

The final two factors would generally be discussed separately, but McNelly's arguments relating to both are so intertwined that it makes more sense to deal with them at the same time.

McNelly reinvigorates his argument that he "was not adequately informed of the specifics of the plea agreement." He argues that "the fact he believed he was told he was going to be sentenced to 12 and a half years shows that [he] was misled into taking this plea." Similarly, McNelly argues that "the fact [he] was told he would only serve half the 25 year sentence shows that the plea was not fairly and understandingly made." Thus, he argues that he should be allowed to withdraw his plea.

In response to these same arguments, and in relation to the second and third factors generally, the trial judge noted:

> "I have presided over this case since the beginning and have had an opportunity to evaluate the credibility of witnesses on the stand today, and this is clearly a situation where the defendant made a knowing and voluntary decision to enter his plea. The morning of the trial I gave the defendant as much time as he wanted. The record shows that. I would not have put a time frame on it. If we were in a situation where he was seriously contemplating it the Court is more than patient in those situations. I sent the jury home so they weren't waiting and just that they were going to call in to see whether they need to report or not. Obviously, at some point the defendant has to make a decision whether he's going to take a plea or go to trial, but there was no pressure from this Court, nor was there pressure from any party for the defendant to take that plea the morning it was entered. I ensure that that is the case by taking my time through the plea colloquy. *I repeatedly advised him of the sentence of life with a mandatory minimum of 25 years before parole eligibility*; *he understood that*." (Emphasis added.)

14

The trial judge's assertion that McNelly understood the possible sentence before taking the plea is supported by the record. Specifically, at the hearing on the plea, the following exchange occurred between the judge and McNelly:

"The Court: Do you understand that rape as charged in Count 1 of the Second Amended Information is an off-grid felony and it carries with it a life sentence with a minimum mandatory sentence of not less than 25 years, a fine up to $500,000 and lifetime term of postrelease supervision? That also includes lifetime registration. Do you understand that's the potential sentence?

"The Defendant: Yes, sir.

"The Court: And do you understand the actual term of any sentence in this case would be established at the sentencing hearing and that if you were presently on probation, parole or postrelease supervision that that status may be revoked and that any sentence in this case would be imposed in addition to any prior sentence?

The Defendant: Yes, sir.

. . . .

"The Court: And do you feel like anyone, including your attorney, the Court, counsel, anyone outside the courtroom has in any way forced or coerced you to come in here today and make a plea?

"The Defendant: No, sir.

"The Court: So if I were to say that you were making this plea freely, knowingly, voluntarily and intelligently, would you agree with that statement?

"The Defendant: Yes, sir.

"The Court: And do you understand that any sentencing recommendations made by your attorney, whether it be for a departure sentence or in particular sentence, that those are just recommendations to me and I'm not bound by them?

"The Defendant: Yes, sir.

"The Court: In other words, for the offense of rape the prescribed sentence is life with a mandatory minimum of 25 years before parole eligibility and do you understand that that's the potential sentence in this case?

"The Defendant: Yes, sir.

"The Court: And that any argument otherwise is just a recommendation to me, I'm not bound by that argument?

15

"The Defendant: Yes, sir.

. . . .

"The Court: And do you also understand that what you say and do here today is generally final and binding and you would most likely not be allowed to withdraw your plea in the future and ask for a trial?

"The Defendant: Yes."

Based on the record on appeal, it is clear that McNelly was not promised that he would be granted a downward departure to half of the 25 year life sentence normally associated with rape under Jessica's Law. The trial court took its time during the plea colloquy to explain to McNelly the possible sentence he was facing and make sure that he understood it. McNelly cannot now claim that he did not understand the possible sentence he was facing. Moreover, the exchange above shows that he was not coerced or misled in any way and that the plea was entered fairly and understandingly. Accordingly, the last two factors do not weigh in McNelly's favor.

In conclusion, McNelly has failed to meet his burden on appeal of showing that the trial court abused its discretion in denying his presentencing motion to withdraw his plea of nolo contendere to one count of rape under K.S.A. 2013 Supp. 21-5503(a)(3) and (b)(2). Indeed, under K.S.A. 2015 Supp. 22-3210(d)(1), McNelly was required to show "good cause" to withdraw his plea, which he did not show at the trial court and does not show on appeal. As the trial court found at the hearing on McNelly's motion to withdraw his plea, "he was not misled, he was represented by competent counsel, he was not coerced, he was not mistreated, he was not unfairly taken advantage of. The plea was very fair. It was fairly and understandably made, it was intelligently made by him." Thus, the trial court did not err in denying his motion to withdraw his plea.

16

*Is McNelly's Life Sentence for His Conviction of Rape Unconstitutional Under Section 9 of the Kansas Constitution Bill of Rights and the Eighth Amendment to the United States Constitution?*

McNelly argues that his sentence "is disproportionate given the circumstances of the offense and in comparison to other offenses in Kansas and other jurisdictions. As a result, it violates the Eighth Amendment to the United States Constitution [and] § 9 of the Kansas Constitution Bill of Rights." Accordingly, McNelly requests that this court vacate his sentence and remand for resentencing.

Section 9 of the Kansas Constitution Bill of Rights prohibits "cruel or unusual punishment." The Eighth Amendment to the United States Constitution prohibits "cruel and unusual punishment."

"An Eighth Amendment challenge that the length of a term-of-years sentence is disproportionate given all the circumstances in a particular case is a case-specific challenge and is inherently factual." *State v. Gomez*, 290 Kan. 858, Syl. ¶ 6, 235 P.3d 1203 (2010). Our Supreme Court has recognized, though, "that the Eighth Amendment to the United States Constitution does not require strict proportionality between a crime and a sentence; rather, it forbids only an extreme sentence that is grossly disproportionate to the crime." *State v. Woodard*, 294 Kan. 717, 721, 280 P.3d 203 (2012). Similarly, our Supreme Court has held that "[u]nder § 9 of the Kansas Constitution Bill of Rights, a punishment may be constitutionally impermissible, although not cruel or unusual in its method, if it is so disproportionate to the crime for which it is inflicted that it shocks the conscience and offends fundamental notions of human dignity." *Gomez*, 290 Kan. 858, Syl. ¶ 9.

> "In determining whether a sentence is cruel or unusual, a district court must make both legal and factual inquiries. [Citation omitted.] These inquiries invoke a bifurcated

17

standard of review: without reweighing the evidence, the appellate court reviews the factual underpinnings of the district court's findings under a substantial competent evidence standard, and the district court's ultimate legal conclusion drawn from those facts is reviewed de novo. [Citations omitted.]" *Woodard*, 294 Kan. at 720.

In reviewing a defendant's challenge to his or her sentence based on § 9 of the Kansas Constitution, an appellate court will look to the three-pronged test established in *State v. Freeman*, 223 Kan. 362, 574 P.2d 950 (1978). The following factors are to be considered:

"(1) The nature of the offense and the character of the offender . . . with particular regard to the degree of danger present to society . . . ;
"(2) A comparison of the punishment with punishments imposed in this jurisdiction for more serious offenses . . . ; and
"(3) A comparison of the penalty with punishments in other jurisdictions for the same offense." *Freeman*, 223 Kan. at 367.

The outcome of a challenge is not predicated on any single factor. *State v. Seward*, 296 Kan. 979, 982, 297 P.3d 272 (2013). Still, one factor may be persuasive enough that it commands a certain outcome. *State v. Ortega-Cadelan*, 287 Kan. 157, 161, 194 P.3d 1195 (2008). Still, the appellate court should consider each factor. *Ortega-Cadelan*, 287 Kan. at 161. Where the defendant advances arguments on the proportionality of the punishment as it relates to the specific crime, the facts surrounding the individual's case are a necessary part of the analysis. *Ortega-Cadelan*, 287 Kan. at 161.

When a defendant's challenge to his or her sentence is based on the Eighth Amendment to the United States Constitution, an appellate court must first compare the seriousness of the offense and the severity of the sentence. *Gomez*, 290 Kan. 858, Syl. ¶ 5. It is uncommon for this threshold analysis to result in a finding of gross disproportionality. *Gomez*, 290 Kan. 858, Syl. ¶ 5. The analysis may include considering

18

(1) the defendant's state of mind and motive; (2) the resulting harm to the victim or society; (3) the defendant's criminal history; and (4) the defendant's propensity for violence. *Gomez*, 290 Kan. 858, Syl. ¶ 5. If the court finds that the defendant's sentence is grossly disproportionate, only then will the court compare the defendant's sentence to the sentences of other offenders in the same jurisdiction and the sentences of other offenders who have committed the same crime in different jurisdictions. *Gomez*, 290 Kan. 858, Syl. ¶ 5.

Based on the explanations of each analysis, the analysis for a challenge based on § 9 of the Kansas Constitution Bill of Rights and the analysis for a challenge based on the Eighth Amendment to the United States Constitution prove very similar. Our Supreme Court has acknowledged that the "analysis under the *Freeman* factors for the Kansas constitutional challenge applies with equal force to the first of the classifications for an Eighth Amendment challenge." *State v. Ross*, 295 Kan. 424, 429, 284 P.3d 309 (2012). Thus, we will first examine the *Freeman* factors for the § 9 challenge, while also using the analysis to determine whether McNelly has met the threshold requirement for his Eighth Amendment challenge. Then, if necessary, we will move on to the latter part of the Eighth Amendment analysis.

*First Freeman Factor: The Nature of the Offense and the Character of the Offender, With Particular Regard to the Degree of Danger Present to Society*

Under the first *Freeman* factor:

> "The nature of the offense and the character of the offender should be examined with particular regard to the degree of danger present to society; relevant to this inquiry are the facts of the crime, the violent or nonviolent nature of the offense, the extent of culpability for the injury resulting, and the penological purposes of the prescribed punishment[.]" *Freeman*, 223 Kan. at 367.

19

McNelly argues that he does not pose a threat to society. He supports his argument by asserting that he lacks a significant criminal history and that "he was a strong candidate for sexual offender treatment."

We note that the *Freeman* analysis does not specifically include a call to consider an offender's criminal history. In fact, McNelly acknowledges that past courts have not taken an offender's criminal history into account when performing a case-specific analysis on his or her sentence. See *Seward*, 296 Kan. 979. But under the Eighth Amendment threshold analysis an offender's criminal history may be considered. See *Gomez*, 290 Kan. 858, Syl. ¶ 5. Still, it is only one part of the greater analysis. Thus, we will not make a great deal out of McNelly's criminal history or lack thereof. McNelly argues that his history does not show a threat to society. Yet, McNelly points out that his "most recent conviction was a violation of a protection [from] abuse order in 2008." This tends to show that McNelly may have a propensity for violence. Even so, we cannot discuss his past convictions in great detail as the facts surrounding them are not included in the record.

Next, we must consider the penological purposes of the punishments prescribed under Jessica's Law. The legislative purpose of Jessica's Law is to protect children of Kansas by removing from society the offenders who commit sexual crimes against children. *State v. Spencer*, 291 Kan. 796, 823-24, 248 P.3d 256 (2011). Legitimate penological purposes include "retribution, deterrence, incapacitation, and rehabilitation." *Gomez*, 290 Kan. 858, Syl. ¶ 7. The United States Supreme Court has acknowledged "grave concerns over the high rate of recidivism among convicted sex offenders and their dangerousness as a class." *Smith v. Doe*, 538 U.S. 84, 103, 123 S. Ct. 1140, 155 L. Ed. 2d 164 (2003). Furthermore, our own Supreme Court has recognized "historically a sex offense against a minor has been treated as a forcible or violent felony without regard to whether there is physical force." *State v. Mossman*, 294 Kan. 901, 912, 281 P.3d 153 (2012). The seriousness of these crimes and their effect on children cannot be overstated.

20

McNelly pled no contest to Count 1 of the 16 count complaint or information that was filed against him. By entering his plea of nolo contendere, McNelly was acknowledging that a jury could have found him guilty of the charge in Count 1. Count 1 alleged

> "that on or about the 24th day of May 2014, in Saline County, Kansas, Basil Scott McNelly, did unlawfully, feloniously and knowingly have sexual intercourse, to wit: penile penetration, with EM (DOB: XX/XX/2005), a child under 14 years of age, and the defendant was 18 years of age or older at the time of the offense. Rape, in violation of K.S.A. 2013 Supp. 21-5503(a)(3) [and] (b)(2), an off-grid felony (Life sentence—Minimum mandatory sentence of not less than 25 years, fine up to $500,000; Postrelease or parole supervision term of life)."

McNelly's victim, E.M., is also his biological daughter. Based on the dates from Count 1, when the rape occurred McNelly was about 41 years old and E.M. was about 8 or 9 years old. On October 2, 2014, E.M. was interviewed by a detective from the Salina Police Department. In that interview, E.M. told the detective "[t]hat she had fallen asleep in her parent's bedroom and that her father came in the bedroom and pulled his wiener out." The detective confirmed that when E.M. said "wiener" she actually meant "penis." When the detective asked E.M. what happened after McNelly pulled his penis out, "[s]he said that he had put it halfway in." E.M. told the detective that McNelly rubbed his penis on "the inside and the outside of her vagina." E.M. also told the detective that on other occasions McNelly had asked her to touch his penis; masturbated in front of her; licked her vagina; rubbed his penis on the outside of her vagina; and made her lick his penis.

The trial court found that McNelly had subjected E.M. to "an ongoing situation of sexual abuse." The court also noted that McNelly had used his position as E.M.'s father to perpetrate the abuse—and that "the defendant is the person that that child should look to for protection, guidance, and parenting. And that . . . speaks volumes of the character of

21

the defendant." The court also found that McNelly was "solely culpable for the resulting psychological damage" to E.M. Those findings are supported by the record.

McNelly argues, though, that his danger to society is mitigated because he is a strong candidate for sexual offender treatment. McNelly argued to the trial court that his psychosexual evaluation stated that he "displayed low risk, minimal needs, and a high responsivity to treatment and supervision." In truth, the evaluation stated

> "McNelly's treatment plan should focus on identifying and reducing his areas of dynamic risk and needs including: deviant sexual preference, relationship stability, boundaries, social rejection, lack of concern for others, general social rejection, impulsivity, cooperation with supervision, emotional management, and poor problem solving. His treatment plan should be updated as needed. His need for treatment should be evaluated periodically to ensure that the level and modality of treatment is matched to his level of risk. He should receive periodic maintenance polygraphs to ensure compliance with supervision and treatment. *At such a time as* Mr. McNelly has displayed low risk, minimal needs, and a high responsivity to treatment and supervision, *as verified by non-deceptive maintenance polygraphs*, his need for treatment should be re-evaluated." (Emphasis added.)

The emphasized language from the evaluation clarifies McNelly's assertion that the evaluation stated he had "displayed low risk, minimal needs, and a high responsivity to treatment and supervision." It is clear that this assertion misstates the evaluation's recommendation. Instead, the recommendation should be understood to mean that *only when* "McNelly has displayed low risk, minimal needs, and a high responsivity to treatment and supervision" *as indicated from the results of the polygraph tests given during his future treatment* then his need for treatment should be re-evaluated. McNelly's proposition that he has shown "a high responsivity to treatment and supervision" cannot stand in light of the other language from the evaluation. Furthermore, it cannot stand logically, as McNelly had not begun any treatment at the time of his evaluation, making it

impossible for the evaluating physician to know whether he was amenable to treatment. Moreover, McNelly's assertion is disproved by the evaluation's summary which states the following: "As Mr. McNelly has not successfully completed prior sex offender specific treatment, it is unlikely that he has developed the capacity to manage his symptomatology and risk . . . . McNelly does not appear motivated to participate in treatment, and does not take responsibility for the offense." For these reasons, McNelly's assertion that he was a strong candidate for sexual offender treatment does not hold up.

Having declined to place great weight on McNelly's criminal history and having found that McNelly's assertion that he was a strong candidate for sexual offender treatment was not supported by the record, we determine that McNelly's arguments under the first *Freeman* factor are weak. The trial court's findings of fact related to McNelly's sentence are supported by substantial competent evidence. Furthermore, the facts surrounding McNelly's case show that his sentence is not so disproportionate to his crime that it "shocks the conscience and offends fundamental notions of human dignity." *Gomez*, 290 Kan. 858, Syl. ¶ 9.

*Second Freeman Factor: A Comparison of the Sentence With Sentences Imposed in This Jurisdiction for More Serious Offenses*

Under the second *Freeman* factor, this court will undertake "[a] comparison of the punishment with punishments imposed in this jurisdiction for more serious offenses, and if among them are found more serious crimes punished less severely than the offense in question the challenged penalty is to that extent suspect[.]" *Freeman*, 223 Kan. at 367.

McNelly argues that he "would have faced a less severe sentence had he murdered the victim." McNelly specifically claims that he would have been better off from a sentencing standpoint had he pled guilty to a charge of second-degree murder.

Additionally, McNelly argues that lifetime postrelease supervision makes his sentence disproportionate to his crime of conviction.

This argument has been raised before without any success. Our Supreme Court addressed the argument in *State v. Woodard*, 294 Kan. 717, 280 P.3d 203 (2012), in relation to an offender's sentence for aggravated indecent liberties with a child. In *Woodard*, our Supreme Court found that

"[t]he fact that the penalty for certain categories of homicide may be less severe than the penalties for other, nonhomicide crimes does not automatically render the penalties for the nonhomicide crimes unconstitutional. There is no strict linear order of criminal activity that ranks all homicides as the most serious crimes and all nonhomicide crimes as less serious, with the corresponding penalties necessarily ranking in diminishing durations of imprisonment." *Woodard*, 294 Kan. at 723-24.

In *State v. Seward*, 296 Kan. 979, 988, 297 P.3d 272 (2013), our Supreme Court applied *Woodard* to an offender's challenge to his convictions for rape and aggravated criminal sodomy. The *Seward* court held that the reasoning from *Woodard* applied equally to a sentence based on rape, because rape is "at least as serious as aggravated indecent liberties." *Seward*, 296 Kan. at 988.

In *Mossman*, 294 Kan. at 917, our Supreme Court also held that an offender's "sentence to lifetime postrelease supervision is not grossly disproportionate in relation the sentence applicable to second-degree murder in Kansas when we consider the penological purposes, the seriousness of the crime, and the other concerns discussed in relation to the first *Freeman* factor." Thus, the court held that the difference in proportionality between the offender's sentence and one for second-degree murder was not so significant that the second *Freeman* factor outweighed the first *Freeman* factor. *Mossman*, 294 Kan. at 917.

24

Finally, we note that McNelly concludes his argument by contending that our Supreme Court failed to adequately consider the fact that "[i]t is a matter of law that in this case, intentional, second-degree murder would have been a far less severe sentence." Without offering any opinion on the matter, we simply state that the adequacy of our Supreme Court's consideration of the issue is theirs alone to reconsider.

Here, we are faced with a nearly identical argument as was presented in *Woodard*, *Seward*, and *Mossman*. Accordingly, we come to a nearly identical conclusion. McNelly challenges his sentence by asserting that it is disproportionate because it is punished more severely than second-degree murder. First, we highlight that "[t]here is no strict linear order of criminal activity that ranks all homicides as the most serious crimes and all nonhomicide crimes as less serious, with the corresponding penalties necessarily ranking in diminishing durations of imprisonment." *Woodard*, 294 Kan. at 723-24. Next, we find that McNelly's sentence, including lifetime posrelease supervision, "is not grossly disproportionate in relation to the sentence applicable to second-degree murder in Kansas when we consider the . . . concerns discussed in relation to the first *Freeman* factor." *Mossman*, 294 Kan. at 917. Thus, we find that the second *Freeman* factor does not outweigh the first *Freeman* factor and does not weigh in McNelly's favor.

*Third Freeman Factor: A Comparison of the Sentence With Sentences From Other Jurisdictions for the Same Offense*

Under the third *Freeman* factor, this court makes "[a] comparison of the penalty with punishments in other jurisdictions for the same offense." *Freeman*, 223 Kan. at 367.

McNelly argues that "while other states do have similar punishments, Kansas is particularly harsh as it does not permit release from supervision although many other states do."

25

Our Supreme Court has expressly held that the sentencing scheme under Jessica's Law is "not out of line with other jurisdictions." *Woodard*, 294 Kan. at 725. McNelly even concedes that this issue was specifically addressed in *Seward*. The court in *Seward* held that "Kansas does not have the harshest penalties in the nation for the crimes of rape and aggravated criminal sodomy committed by an adult against a child younger than 14." 296 Kan. at 990. The court reached its conclusion after recognizing that a majority of other jurisdictions allow for the imposition of a life sentence, and many other jurisdictions allow for the imposition of a mandatory minimum for time served. *Seward*, 296 Kan. at 989.

We do not claim that the sentencing scheme under Jessica's Law is particularly offender-friendly nor is that a required finding when considering whether an offender's sentence is unconstitutionally disproportionate. Instead, we follow *Seward* and find that McNelly's sentence for rape of a child under the age of 14 years old is not grossly disproportionate when compared to the sentences for the same crime in other jurisdictions. Thus, the third *Freeman* factor does not weigh in McNelly's favor.

Because none of the three *Freeman* factors weigh in McNelly's favor, his case-specific challenge under § 9 of the Kansas Constitution Bill of Rights fails. Accordingly, and in line with our Supreme Court's holding in *Ross*, McNelly's challenge to his sentence under the Eighth Amendment to the United State Constitution also fails because he was not able to make a threshold showing of gross disproportionality. Thus, his sentence does not constitute unconstitutional cruel or unusual punishment or both.

*Is Lifetime Registration Under KORA Unconstitutional Under Section 9 of the Kansas Constitution Bill of Rights and the Eighth Amendment to the United States Constitution?*

The specific provisions of KORA determine which offenders must register as part of their sentence and for how long they must register. Under K.S.A. 2013 Supp. 22-

4902(c)(1), rape as defined in K.S.A. 2013 Supp. 21-5503 is considered a "sexually violent crime." K.S.A. 2013 Supp. 22-4906(d)(1) requires offenders convicted of rape under K.S.A. 21-5503 to register for the duration of the offender's lifetime. McNelly was charged and pled no contest to rape under K.S.A. 2013 Supp. 21-5503(a)(3) and (b)(2); thus, he was required to register for the duration of his lifetime.

On appeal, McNelly argues that lifetime registration under KORA is unconstitutional as a violation of the prohibition against cruel and unusual punishment found in § 9 of the Kansas Constitution Bill of Rights and the Eighth Amendment to the United States Constitution.

In *State v. Petersen-Beard*, 304 Kan. 192, 377 P.3d 1127 (2016), our Supreme Court addressed an identical challenge to lifetime sex offender registration under KORA. Our Supreme Court recognized that it had to answer a threshold question—"whether the challenged sanction is punishment at all for purposes of either the Eighth Amendment or § 9, or is rather a civil and nonpunitive sanction." 304 Kan. at 194. The court found that "our legislature intended those provisions of KORA to be a nonpunitive and civil regulatory scheme rather than punishment. [Citation omitted.]" *Petersen-Beard*, 304 Kan. at 195. Thus, the court held that KORA's sex offender registration requirements do not qualify as punishment under § 9 of the Kansas Constitution Bill of Rights or the Eighth Amendment to the United States Constitution. *Petersen-Beard*, 304 Kan. at 210-11. Accordingly, the court agreed with the State that a challenge to KORA's registration requirements based on § 9 or the Eighth Amendment could not survive because those constitutional provisions only proscribe cruel or unusual punishment or both. *Petersen-Beard*, 304 Kan. at 194.

McNelly acknowledges the existence of *Petersen-Beard* and acknowledges the holding of that case. Nonetheless, he respectfully submits "that *Petersen-Beard* was

27

wrongly decided and a proper review of KORA and its onerous requirements leads to the conclusion its implementation violates both the United States and Kansas Constitutions."

"This court is duty bound to follow Kansas Supreme Court precedent absent some indication that the court is departing from its previous decision. [Citation omitted.]" *State v. Meyer*, 51 Kan. App. 2d 1066, 1072, 360 P.3d 467 (2015). Here, we have no indication that our Supreme Court is departing from its holding in *Petersen-Beard*, which was filed less than 1 year ago. Thus, we will not entertain McNelly's argument that lifetime registration violates his rights under § 9 of the Kansas Constitution Bill of Rights or the Eighth Amendment to the United States Constitution.

Because we find *Petersen-Beard* to be finally determinative on the issue, McNelly's § 9 and Eighth Amendment challenges to lifetime registration as a sex offender under KORA fails.

Affirmed.